**In re HAUKOS FARMS, INC., Debtor.**

**Bankruptcy No. 3–85–445.**

United States Bankruptcy Court,
D. Minnesota.

Dec. 31, 1986.

---

William Needler, Chicago, Ill., Zimmerman, Caplan & Reed, Minneapolis, Minn., for plaintiff/petitioner.

Robert Raschke, St. Louis Park, Minn., for Unsecured Creditors Committee.

Edward Klinger, Moorhead, Minn., for PCA.

Peter Orlins, Richfield, Minn., for Kleepsie Estate.

Robert F. Gay, Minneapolis, Minn., for Lutheran Broth.

Carrie Hefte, Oppenheimer Wolff & Donnelly, Minneapolis, Minn., for Federal Land Bank.

ORDER DENYING DEBTOR'S MOTION TO VACATE ORDER ENTERED OCTOBER 29, 1986; REJECTING DEBTOR'S THIRD–AMENDED DISCLOSURE STATEMENT AS INADEQUATE; REJECTING CREDITOR COMMITTEE'S DISCLOSURE STATEMENT AS INADEQUATE; GRANTING RELIEF FROM STAY TO PROBATE ESTATE OF JOHN AND VERNA KLEEPSIE; GRANTING RELIEF FROM STAY TO LUTHERAN BROTHERHOOD

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter is before the Court on the following motions and hearing held November 19, 1986: Debtor's motion to amend, vacate or reconsider an Order entered October 29, 1986 granting relief from stay to Federal Land Bank of St. Paul and Willmar; adequacy of Debtor's Third Amended Disclosure Statement; adequacy of Unsecured Creditors Committee's Disclosure Statement; motion for relief from stay by the John and Verna Kleepsie probate estate; motion for relief from stay by Lutheran Brotherhood. William Needler represents the Debtor; Carrie Hefte represents Federal Land Bank; Robert Raschke represents the Unsecured Creditors Committee; Peter Orlins represents the Kleepsie estate; Robert Gay represents Lutheran Brotherhood; and Edward Klinger represents Production Credit Association of Alexandria. Having heard and considered arguments of counsel, reviewed briefs and the entire Court file, the Court being fully advised in the matter now makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## I.

This bankruptcy case has been pending in Chapter 11 since February 28, 1985. The Debtor is a closely held family farm corporation, whose primary debt is owed to four secured and undersecured creditors. Apparent debt at filing was $1,528,160.00, of which $61,978.00 was scheduled as unsecured. Of the scheduled unsecured debt, $31,951.00 represents noninsider debt. Assets were scheduled at $1,229,000.00.

The appendix to this opinion is an assimilation of information and a computation of values made by the Court (using the Debtor's figures whereever possible) and is based upon a thorough review of the Court file, in an attempt to trace the financial developments in the case and to understand it from the Debtor's perspective. Although there is no unusual, inherent complexity to this case, it has become confusing due in large part to the length of its pendency and the disarray of the Debtor's Third Amended Disclosure Statement. The values shown in the appendix do not constitute a finding by the Court as to actual values, regarding either assets or debt. But for purposes of the present proceedings, the

Court assumes the values to be substantially accurate.

The major secured creditors in the case are: Federal Land Bank (FLB); Production Credit Association of Alexandria (PCA); the John and Verna Kleepsie probate estate (Kleepsie); and Farmers Home Administration (FHA). According to the Debtor, both FLB and PCA are undersecured; FLB by $30,000.00, and PCA by $352,349.00. FHA and Kleepsie are fully secured.

Apparent financial circumstances of the Debtor, both at filing and at present, are discussed in later sections of this opinion where appropriate, and the discussion is based primarily on information in the appendix, except as indicated otherwise. The balance of this section of the opinion is devoted to a rendition of the procedural history of the case in bankruptcy.

On March 26, 1985, the Court granted an emergency application of the Debtor to incur secured debt to finance its 1985 operating season. On April 15, and April 24, 1985, FLB and Commodity Credit Corporation (CCC) respectively filed their motions for relief from stay. Both matters resulted in stipulations at hearing on May 3, 1985, which were subsequently approved by the Court.

On June 28, 1985, the Debtor, by its counsel, filed a Plan of Reorganization. In his June 27, 1985, cover letter to the Plan, Debtor's counsel represented that a disclosure statement was temporarily delayed due to a breakdown in word processing equipment. The first Disclosure Statement was subsequently filed on May 8, 1986, nearly one-year later.

In the meantime, on July 11, 1985, PCA filed its motion for relief from stay. That matter was resolved by stipulation of the parties at hearing on August 2, 1985, and approved by the Court on the same day.

On August 30, 1985, the Debtor filed a motion for extension of the exclusivity period in which it was entitled to obtain confirmation of its Plan. That motion was denied at hearing on October 3, 1985. Thereafter, the Debtor and John Deere entered into an adequate protection stipulation which was filed on December 12, 1985.

On June 24, 1986, FLB filed a second motion for relief from stay based on an alleged failure of the Debtor to comply with certain terms of the stipulation approved by the Court in May of 1985. By its terms, the stipulation entitled FLB to relief from stay on default. A dispute had arisen regarding the nature, amount and application of certain payments required by the stipulation. In addition to the disputed payments, the stipulation required the Debtor to pay, on or before March 31, 1986, delinquent 1984 real estate taxes owing on property subject to FLB's mortgage. There was never a dispute between the parties regarding payment of these taxes. As of July 9, 1986, the date of the hearing on FLB's second motion, the taxes had not been paid.

The Court ruled in the Debtor's favor regarding the disputed payments. The Debtor represented to the Court that it had withheld payment of the 1984 taxes when due under the stipulation, because of its dispute with FLB. However, the Debtor admitted at the hearing that it spent the funds for other purposes and did not have money available at the time to pay the taxes. Under the terms of the stipulation, FLB was entitled to relief from stay based on undisputed default by the Debtor and its inability to timely cure.

Nevertheless, the Court continued FLB's motion to the date and time set for hearing on adequacy of the Debtor's Disclosure Statement that had, by then, been finally filed; and the Court directed the Debtor to provide for payment of the taxes under the Plan. Hearing on adequacy was scheduled for July 15, 1986, and by that time numerous objections to adequacy had been filed by the United States Trustee and several creditors. The hearing was continued to allow the Debtor time to amend the Disclosure Statement to meet the objections. FLB's motion for relief from stay was continued as well.

On August 6, 1986, the Debtor filed a Second Amended Disclosure Statement and

Plan. Numerous objections to adequacy were again filed. On September 3, 1986, the Court issued an Order sustaining 15 separate and substantial objections to adequacy of the Second Amended Disclosure Statement.

The Order also set FLB's motion for relief from stay for hearing on September 17, 1986. But the Debtor was given yet another opportunity to file an adequate disclosure statement and have it considered prior to a ruling on FLB's motion. The Court provided in the September 3, 1986 Order that, if a third amended disclosure statement and plan were filed no later than three business days prior to the September 17 scheduled hearing, the Court might consider adequacy at the time of the hearing on FLB's motion.

On September 16, 1986, the attorney for FLB contacted the Court and represented that the Debtor's attorney had indicated to her that he was prepared to file a third amended disclosure statement and plan at or shortly after the September 17 hearing. Based on the information conveyed to the Court, FLB requested a continuance of the September 17 hearing to October 22, 1986.

In the meantime: on September 17, 1986, PCA filed its motion for dismissal of the case; on October 6, Lutheran Brotherhood filed its motion for relief from stay; and on October 22, 1986, the day of the continued hearing on FLB's motion, the Unsecured Creditors Committee filed its Disclosure Statement and Liquidation Plan. Of more significance, however, at the time of the hearing on FLB's motion, is what was not filed. The Debtor had still not filed a third amended disclosure statement.

The Court issued its order from the bench granting FLB relief from the stay at the October 22, 1986 hearing. The Order was entered on October 29, 1986. The Debtor filed its Third Amended Disclosure Statement on October 28, 1986; and on November 10, 1986, filed its motion to amend, vacate or reconsider the Court's Order granting FLB relief from the stay. The Debtor paid the 1984 real estate taxes

required by its stipulation with FLB on November 18, 1986.

At the October 22, 1986 hearing, Lutheran Brotherhood had requested continuance of hearing on its motion for relief from stay. It thereafter renewed the motion; and, a separate motion for relief from stay was filed by Kleepsie on November 10, 1986. All pending motions, except PCA's motion to dismiss, were heard on November 19, 1986, along with adequacy of both Disclosure Statements, and all matters heard are covered by this Order.

## II.

■ An order granting relief from stay in a bankruptcy case is a final order, subject to appeal. Ordinarily a motion to vacate such an order should be based upon the assertion of newly raised material facts which existed at the time of the hearing that resulted in the order from which the relief is sought. Furthermore, a showing should be made by the parties seeking vacation, that the asserted material facts either: (1) were not known to the party at the time of the hearing, through no fault or neglect; or, (2) if known, that they were not then asserted due to excusable neglect, and that failure to consider the newly raised facts in a context of a motion to vacate would result in a substantial injustice.

■ The Debtor did not raise any relevant facts in connection with its motion to vacate that were not already before the Court at the hearing on FLB's motion for relief from stay. It did argue that certain 1984 real estate taxes had been paid and that the Third Amended Disclosure Statement and Plan had been filed after entry of the relief from stay Order. However, these facts are not relevant to a motion to vacate the Order.

Even if they were relevant, those facts are not material. The Order granting FLB relief from stay was not based on the Debtor's failure to have paid 1984 real estate taxes. The Court in earlier hearings on issues involving FLB and the Debtor had, in effect, excused the Debtor from literal

compliance with a stipulation requiring payment of the taxes as agreed by the parties. The Court had instructed the Debtor to provide for payment in a timely filed amended disclosure statement and plan.[1] The Court's comments on the record at the October 22, 1986 hearing regarding payment of 1984 real estate taxes, were merely intended as an example of the Court's indulgence of the Debtor's conduct during pendency of the case.

The primary basis for the Order granting FLB relief from stay was the length of time the case had been pending without significant progress toward confirmation. No acceptable Debtor disclosure statement was before the Court, despite repeated allowances and opportunities afforded the Debtor beyond Court imposed deadlines that had been established in an environment where FLB and others had motions pending for relief.

The fact that the Debtor has, since the Order granting FLB relief, filed its Third Amended Disclosure Statement and Plan, is also not material, even if it could be considered relevant. This case was filed on February 28, 1985. The Debtor has enjoyed the liberal protection of the Court under the Bankruptcy Code for nearly two years. The Third Amended Disclosure Statement, like its predecessors, is wholly inadequate and brings the Debtor no closer to reorganization than it was when the case was filed.[2]

There exists no realistic probability of successful reorganization in the near future for this case under the present circumstances. Based on the foregoing, and on the record made at the October 22, 1986, hearing on FLB's motion for relief from stay, the Debtor's motion for vacation of this Court's Order entered October 29, 1986, must be denied.

### III.

■ The Debtor's Third Amended Disclosure Statement is, at best, a continued product of patch and paste. It is incomplete, inconsistent, vague and contradictory. The financial information and accompanying explanations in the appendix to this opinion represent the Court's understanding of what the Debtor claims its financial position and relationship with its creditors was at commencement of the case, and what it presently is. All of the information and explanation furnished, or alluded to, in the appendix is minimally necessary for an adequate disclosure statement. Little of the necessary information and explanation can be gleaned from the Debtor's Third Amended Disclosure Statement. Furthermore, the document is arranged in a confusing fashion. Information regarding any individual creditor is spread all over the Statement.

Perhaps the most significant indication of the Statement's inadequacy is that in an attempt to understand it, and in compiling the information in the appendix, the Court

---

1. Literal application of the stipulation would have entitled FLB to relief from stay in July 1986 pursuant to its motion, based on failure of the Debtor to comply with an adequate protection stipulation entered by the parties and approved by the Court in May 1985.

2. In light of *In re Ahlers,* 794 F.2d 388 (8th Cir.1986), which apparently renders illusory the concept of adequate protection for real estate mortgagees, it is fundamentally unfair to allow a case to remain pending for two years (and in this case, indefinitely beyond) without disposition, except in the most unusual circumstances. This is especially so in an environment of precipitously declining real estate values. Otherwise, a debtor can reorganize at the expense of mortgagees through the post-petition shift of secured

debt to unsecured debt due to substantial economic depreciation.

The *Ahlers* solution of 100 percent payment plans to undersecured and unsecured creditors is, unfortunately, also illusory. In the vast majority of cases, if a farmer could realistically fund a 100 percent plan, there would be no bankruptcy petition filed. Usually, a farmer's present inability to pay creditors is due to severe economic factors, massive in both scope and complexity, over which he has no control. The value of what can be produced under ideal conditions is, in most cases, insufficient to service debt leveraged at a 100 percent asset value. Under these circumstances, undersecured and scheduled unsecured creditors have little realistic prospect of receiving any significant payment.

found it necessary to expend in excess of two full days thoroughly reviewing the entire Court file in the case. Rather than facilitating the Court's understanding of the Debtor's financial circumstances and relationship with creditors, the Third Amended Disclosure Statement impeded it.[3]

The Third Amended Disclosure Statement standing alone is, for the most part, unintelligible. It certainly does not provide sufficient information in a reasonable manner that would enable a voting creditor to make an informed decision on how to exercise a ballot. Once again, the Debtor's Disclosure Statement, must be rejected as providing inadequate information.

## IV.

■ The Disclosure Statement filed by the Unsecured Creditors Committee proposes a total liquidation of the estate, with payment to creditors according to Code priorities, except as modified regarding the unsecured class. The Statement is inadequate.

Values representing the Debtor's property differ substantially from the position taken by the Debtor in the case. The Disclosure Statement should inform creditors of the basis for the Committee's valuations. Similarly, valuation of debts owing fully secured and undersecured creditors differs substantially from the Debtor's position in several instances. The Disclosure Statement should inform creditors of the basis for its valuation of the total individual debts it shows owing to FHA, CCC, FLB and PCA.

Additionally, the Disclosure Statement should provide an estimate of the liquidation expenses to be reasonably anticipated over and above the agent's fee. Furthermore, the Statement should estimate the impact, if any, of federal and state income taxes in liquidation, and should disclose who will be liable for payment. If the Committee takes the position that the agent will have no liability for payment; and if the Plan does not intend that the agent satisfy liquidation generated tax liability from liquidation proceeds prior to distribution to unsecured creditors; then it should so state. If the Committee believes that liquidation might generate income tax liability; and if the Plan intends that the agent satisfy any such liability prior to distribution to unsecured creditors; but the nature and extent of liability, if any, is unknown; then the Committee should make that disclosure.

Finally, the Disclosure Statement is inadequate in two other respects. No disclosure is made with respect to bonding of the liquidating agent. If the agent is to serve without bond, the Statement should conspicuously disclose that. Lastly, the Disclosure Statement is executed by the Committee's attorney, but not by the individual Committee Member proponents. Execution by the attorney is insufficient.

The Disclosure Statement of the Unsecured Creditors Committee filed on November 19, 1986, is inadequate based on the foregoing reasons.[4]

## V.

The motions for relief from stay brought by Lutheran Brotherhood and Kleepsie involve 480 acres of real estate that are subject to a first mortgage in favor of Lutheran Brotherhood in the present amount of $14,770.00, and a contract for

3. An appropriate test on appeal of the adequacy issue might be whether an appellate court can understand these matters upon review of the document without review of the file or the appendix to this opinion.

4. Numerous other objections to adequacy were filed by the Debtor. Of the $61,978.00 in scheduled unsecured debt, $31,951.00 represents noninsider debt. Of that amount, $17,810.00 is held by members of the Unsecured Creditors Committee. Of the remaining noninsider debt of $14,141.00, $8,362.00 is held by one creditor who apparently declined to serve on the Committee. All undersecured creditors have actively participated in the case. With the information required by this Order, all creditors should have sufficient information to exercise a ballot on the Committee's Liquidation Plan. Accordingly, all objections by the Debtor not specifically addressed in this Order are overruled.

deed balance to Kleepsie of $103,230.00. The property was originally sold by contract, subject to the mortgage, by John and Verna Kleepsie to Ann Vaage. The Kleepsies have since died and the Kleepsie probate estate is the successor to the vendor's interest. The Debtor is successor to the vendee's interest though assignment by Vaage prior to bankruptcy. The Debtor claims that the present value of the property is $192,000.00.

The contract, by its terms, became due in full on March 1, 1986, with a balance then owing of $110,000.00. That amount included a contract for deed payment of $5,000.00, plus $8,000.00 interest due on March 1, 1985, that had not been paid, and the full balance owed Lutheran Brotherhood. The mortgage also became due and payable in full on March 1, 1986. Kleepsie has not received any payment during pendency of the case, and Lutheran Brotherhood has not received a payment since November of 1985, when an interest payment was made.

Although the Debtor concedes that it has no equity in the property,[5] it claims that the property is needed for an effective reorganization. The Debtor argues that Lutheran Brotherhood and Kleepsie are adequately protected by the value in the property over and above the amounts owing them. According to the Debtor, total amount owed is $118,000.00.

■ However, relief from stay is appropriate in this case. Successful reorganization is unlikely. But even if it were otherwise likely, the Debtor's proposed treatment of these creditors is unfair and inequitable under the circumstances of the case, and the Debtor's Plan would not be approved by the Court over their objections.

With relief from stay granted FLB, successful reorganization under the Debtor's Plan is highly doubtful. But even absent that factor, reorganization would be unlikely based on the Debtor's apparent position regarding the value of its assets and the amount of existing liabilities. The Debtor proposes to attempt a 100 percent payment plan to all creditors. Assuming that the information in the appendix to this opinion is accurate, the proposal is simply not realistic.

Based on the Court's reconciliation of the Debtor's figures, it appears that the Debtor liquidated $331,066.00 in assets and reduced its debt by $327,628.00 during the two-year pendency of the case. Although, at first glance, the debt reduction is seemingly significant, it is in large part illusory. Of the total amount shown, $205,718.00 represents debt that the Debtor was never required to service. That debt reduction was achieved by delivering grain to CCC that had been held under the applicable grain reserve program. Thus, $205,718.00 debt reduction does nothing to ease the Debtor's burden regarding its regularly serviceable debt. The net serviceable debt reduction, if Debtor's figures are accepted, has been $121,910.00 during pendency of the case.[6]

On the other hand, the Debtor's ability to service its debt appears to have declined substantially during the case. According to Exhibit 5 to the Third Amended Disclosure Statement, the value of the stock and crop inventory for 1984, after operating expenses, was $166,787.00. The 1986 crop inventory, which currently provides the Debtor's only source of income as did the

---

5. Debtor's interest in the property is subject to a second mortgage in favor of PCA.

6. The accuracy of this figure is questionable. The major debt reduction occurred with PCA pursuant to stipulation of the parties. PCA, however, in an objection to an earlier Debtor Disclosure Statement, claims that its existing debt is $654,842.00. In light of the position taken by PCA earlier in the case regarding the amount of its debt, its present position cannot be understood from information presently of record. *See* Notes "i" and "j" in the appendix. However, at least one potential problem with the Debtor's figure is that it was calculated, in part, based on the Debtor's application of periodic adequate protection payments in the total amount of $24,000.00 directly to secured debt reduction with no allocation to interest on the debt. Actual amount of the debt owing PCA has not been judicially determined in the case.

1984 inventory, is $135,089.00 after deduction of operating expenses.[7] Thus, the Debtor has in 1986, $31,698.00 less than in 1984 to service debt. Even if its serviceable debt has been reduced by $121,910.00, that reduction appears to be more than offset by the Debtor's decreased annual ability to service debt.

Accordingly, it appears that even accepting the Debtor's value and debt figures, the Debtor is in a worse financial position currently than it was at filing. It is highly unlikely that the Debtor's operation has the present, inherent capability of funding a 100 percent plan or that it could reasonably expect to have that capability in the foreseeable future.[8]

But even if it otherwise appeared that the Debtor had a viable reorganization plan, the proposed treatment of Kleepsie and Lutheran Brotherhood is unfair and inequitable. The Kleepsie contract was due in full on March 1, 1986. Kleepsie has not received a payment since sometime in 1984. The Debtor proposes to withhold payment until two years after the effective date of the Plan, and then make annual payments based on a 25–year amortization schedule at 8 percent interest with a final balloon payment due in 7 years. Under the Plan, Kleepsie is expected to forego any payment for more than four years post-default and at least three years since the entire balance originally became due. The proposal simply does not meet the fair and equitable standard required for confirmation.

The Plan does not propose fair and equitable treatment of Lutheran Brotherhood either. No payment has been made to that creditor since November 1985. The obligation became due in full on March 1, 1986. The Plan proposes to pay the claim in two equal installments. The first would be due 90 days after the Plan's effective date; and the second payment would be due one-year thereafter. In the meantime, the Debtor proposes to pay at least $10,125.00 to unsecured creditors.

Based on the foregoing reasoning, relief from stay should be granted to these creditors.

## VI.

The agriculture industry is in a period of severe economic depression, with no significant abatement likely in the foreseeable future. As the depression continues, the economic illness it carries spreads further and wider throughout the industry, resulting in catastrophic distress and ruin to increasing numbers of debtors and creditors alike. Attempted solution through affirmative political action, legislative and other, has to date been sporadic and, for the most part, ineffective. Indeed, those causes of the malady that can be identified, reveal a condition of such scope and magnitude that it might well be politically insolu-

7. In computing the 1984 figure, debt service interest expense of $75,393.00 was omitted as that is not an operating expense. However, $6,000.00 was added as an estimated operating interest expense to make the 1984 and 1986 operating statements comparable. *See* Exhibit 5 and 6 to the Third Amended Disclosure Statement. For 1986, the $9,020.00 payment of 1984 real estate taxes was omitted as that is not an operating expense either. *See* note "l" to the appendix.

8. This unfortunate reality has special significance to undersecured creditors holding security in the Debtor's interest in real estate. The Debtor claims that its 480 acres being purchased on a contract for deed is presently worth $192,-000.00. The secured claims of Lutheran Brotherhood and Kleepsie total $118,000.00. Any value over and above that amount is secured by a junior lien in favor of PCA. If this property has a present value of $192,000.00, it likely had a substantially higher value when the petition was filed. The value of farm land has declined precipitously in the District of Minnesota during the past two years. In that event, the pendency of this case has likely resulted in the erosion of PCA's position through the conversion of secured to unsecured debt that has little significant prospect of ever being paid. In light of *In re Ahlers, supra,* apparently this creditor had no recourse or remedy to protect against the post-petition loss in value of its security. Under the circumstances, it is no more than pretense to suggest that, however unlikely or improbable the prospect for the Debtor's success, the situation can now be fairly remedied by a Plan that proposes to attempt to pay all creditors 100 percent of their debt.

ble. Perhaps self-healing through time will prove to be the only remedy.

It is this environment of crisis that Bankruptcy Courts are called upon to administer to farmer debtors, and their creditors, the medicinal remedies afforded by Chapter 11 of the Bankruptcy Code. Chapter 11 is designed to redress financial ills that are remediable. It is not designed to provide a cure for wounds severely infected by a hostile economy. A Bankruptcy Court cannot order the price of grain to rise; nor can it enjoin against further decline in the value of farm land. Not surprisingly, where the plight of a debtor is largely the result of a hostile economy, appropriate effective judicial remedy in Chapter 11 to the debtor's condition is often severely limited; and in many cases, is entirely unavailable.

Nevertheless, Bankruptcy Courts have a critically important role in administering to the wounded debtors and the wounded creditors they carry with them into the sanctuary of Chapter 11 bankruptcy; even where those wounds have been caused, and remain infected, by a hostile economy. A Bankruptcy Court can provide a calm and rational atmosphere where realistic and fair remedies, however limited, can be fashioned by the parties and administered, within the parameters of the law, by the Court to the benefit of all concerned.

But in fulfilling its important role, it is crucial that the Bankruptcy Courts, as trial courts, do not succumb to the temptation, which invariably arises from the more distressed cases, to fashion political solutions to general economic problems under the guise of administering proper judicial remedy. Otherwise, the integrity of the Bankruptcy Courts, and of the judicial process itself, will become seriously eroded to the point where chaos and cynicism will replace calm and reason; ultimately rending the fabric of the law and destroying the credibility of the Courts.

It is not the proper business of the Bankruptcy Court to fashion a reorganization plan for a debtor, either at or before confirmation. Furthermore, a Bankruptcy Court cannot confirm parts of a plan and reject others. A plan proposed by a party must either be confirmed or rejected in its entirety.

It is appropriate, and sometimes required, in the context of relief from stay motions, for the Court to make preliminary assessments regarding the likelihood of successful reorganization that go beyond consideration of a particular filed plan. In light of that, and tempered by the comments made earlier in this section of the opinion, the Court makes the following observations.

Successful reorganization is not likely in this case, primarily because the Debtor is unwilling or unable to face the realities of its present financial circumstances and the economy in which it operates. The Debtor proposes to treat its condition with band-aids when in fact successful treatment requires major surgery.

The Debtor owns, or is purchasing by contract for deed, 1,858 acres of real estate. Under circumstances of the case, successful reorganization is unlikely without a major reduction in serviceable debt, that would require substantial liquidation of real estate along with reduction of machinery and equipment. Presently, farm land can usually be rented at substantially less cost than existing debt service requirements for real estate owned.

Furthermore, liquidation of real estate, and the attendant reduction of serviceable debt, would facilitate a scaling back in operation necessary for retrenchment. Substantial liquidation would place the Debtor in a more flexible position to adjust the level of operation from time to time, based on changing relationships between the value of what can be produced and the costs of production.

What the Debtor proposes is essentially business as usual with a restated promise to attempt to pay 100 percent of its debt. Psychological and emotional ties to existing owned real estate are understandable, and the Court is not insensitive or unsympathetic to these feelings. However, any plan in this case that would be

premised upon retention of all real estate owned and being purchased, would simply be unrealistic. A restated promise to attempt to pay 100 percent of debt under circumstances where the ability to consummate that promise does not exist, cannot by itself satisfy the legal and equitable requirements for confirmation under Chapter 11 of the Bankruptcy Code.

The granting of relief from stay does not constitute foreclosure of a mortgage or cancellation of a contract for deed. It merely affords a party granted the relief the right to commence foreclosure or cancellation. It is the sincere hope of the Court that the Debtor yet has time to: rethink its position; negotiate the retention of sufficient homestead real estate; and to come forward with a realistic retrenchment plan of reorganization, supported by an adequate disclosure statement, that will fairly and equitably balance and satisfy the various interests in the case, within the parameters of the Bankruptcy Code.

However, the Debtor has had ample time to come to terms with its financial circumstances during the pendency of this case, and circumstances do not justify reimposing the stay against FLB. Circumstances do justify granting relief from stay to Kleepsie and Lutheran Brotherhood.

ACCORDINGLY, IT IS HEREBY ORDERED:

1. The Debtor's motion to vacate this Court's Order entered October 29, 1986, granting Federal Land Bank of St. Paul and Willmar relief from stay is denied.

2. The Debtor's Third Amended Disclosure Statement is rejected as inadequate.

3. The Creditors Committee's Disclosure Statement is rejected as inadequate.

4. The motion of the John and Verna Kleepsie probate estate for relief from stay is granted.

5. The motion of Lutheran Brotherhood for relief from stay is granted.

6. The attached appendix, pages 1 through 4, are incorporated in and made a part of this Order.

7. Any stay of the effect of this Order must be obtained from the Federal District Court in connection with an appeal.

APPENDIX
ASSETS

| Real Estate: | February 28, 1985 | | December 1986 | |
|---|---|---|---|---|
| Owned 1378 acres | 465,450 | | 465,450[a] | |
| Cont. for Deed Purchase 480 acres | 168,000 | | 192,000[b] | |
| Farm Machinery | 169,261 | | 80,500[c] | |
| Pledged Grain | 205,718 | | 0[d] | |
| Crop Inventory | 191,600 | | 126,069[e] | |
| | | Storage Bin | 5,004[f] | |
| | $1,200,029 | | $869,023 | |
| Decrease in Assets: | | | | $331,006 |

LIABILITIES

| | February 28, 1985 | December 1986 |
|---|---|---|
| FHA (1378 acres, pt.) | 97,912 | 100,000 |
| CCC (Bin) | 11,754 | 4,994 |
| CCC (Grain Loan) | 205,718 | 0[g] |
| FLB (1378 acres) | 298,742 | 405,391[h] |
| PCA (Farm Machinery/ 1984 Grain Inventory/ 480 acres) | 721,349[i] | 477,349[j] |
| Deere (Farm Machinery) | 11,687 | 11,266[k] |
| Kleepsie & Lutheran Bro. (480 acres) | 110,000 | 118,000 |

|  | February 28, 1985 | December 1986 |
|---|---|---|
| Real Estate Tax (1984) | 9,020 | 0[l] |
| Scheduled Unsecured Debt | 61,978 | 61,978 |
| Admin. Expenses (non-operational) |  | 21,554[m] |
|  | $1,528,160 | $1,200,532 |

Decrease in Liabilities: $327,628

a. No information has been furnished by Debtor explaining how this property maintained its prepetition value during the two-year pendency of the case when the value of farm land generally in Minnesota has declined precipitously over the same period.

b. No information has been furnished by Debtor explaining the increase in value assigned this property over that scheduled with the Petition.

c. Apparently, machinery and equipment valued at $75,000 were turned over to PCA for liquidation and application on its debt pursuant to stipulation of the parties filed August 2, 1985, and approved by the Court on the same date. Although the stipulation provides for turnover of $80,000 value, Debtor's Exhibit H to the Disclosure Statement recites $75,000 as the value actually surrendered. No information has been furnished by Debtor explaining the decrease from value assigned this property in the filed schedules, other than the $75,000 transfer.

d. This asset had consisted of certain 1980, 1982, and 1983 grain that was encumbered to CCC under a grain reserve program. Apparently, Debtor had obtained a nonrecourse loan under the program prior to bankruptcy and the grain was fully encumbered at filing. All 1980 and 1983 grain were delivered to CCC pursuant to stipulation of the parties filed and approved by the Court on May 17, 1985. The stipulation provided that the 1982 grain be delivered to CCC upon expiration of the program. Apparently, that has been done because it is not accounted for by Debtor in its liquidation analysis, Exhibit 1 to the Disclosure Statement.

e. See Note 1, *infra.*

f. The value of the storage bin was either accounted for in Debtor's schedules by its inclusion with farm machinery and equipment, or was not accounted for at all. No itemized list was filed with the schedules to support the $169,261 figure. Debtor separately lists the bin in its liquidation analysis, Exhibit 1 to the Disclosure Statement.

g. Apparently, this was never a serviceable debt. Debtor participated in a federal grain reserve program regarding its 1980, 1982 and 1983 grain crop. Although details of the program are not clear from the record, it appears that Debtor obtained a nonrecourse loan from CCC at full value of the crop. Thereafter, Debtor stored the crop in its facility. No repayment of the loan was required unless Debtor elected during the program period to sell the grain. If not sold, delivery to CCC was required at expiration of the program period. Apparently, all of the grain has been delivered. See Note d, *supra.*

h. Using Debtor's figures, the following calculation was made to arrive at the stated figure:

| | | |
|---|---|---|
| Note # 413779–4–0 | $111,060 | |
| Note # 374645–0–0 | 225,934 | |
| Undersecured debt | 30,357 | (See Exhibit C to Disclosure Statement) |
| Interest due December 1, 1986 on secured debt | 38,040 | |
| Total Debt | $405,391 | |

i. This debt was originally scheduled with the Petition at $779,850. However, in its motion for relief from stay filed July 11, 1985, PCA alleged the debt to be $721,349 at filing. The latter figure is also used in Exhibit H to the Debtor's Disclosure Statement.

j. This figure assumes that the PCA debt at filing was $721,349. *See* Note i. Pursuant to motion filed by PCA on July 11, 1985, the parties entered into an adequate protection stipulation, approved by the Court on August 2, 1985, which provided for liquidation of grain inventory and partial liquidation of farm equipment, proceeds payable to PCA. According to Debtor, the value of grain inventory liquidated was $145,000, and the value of equipment sold was $75,000. In Exhibit H to Debtor's Disclosure Statement, Debtor states that, of the $721,349 debt at filing, $369,000 was secured and $352,349 was undersecured. Debtor's calculation then reduces that secured debt: by an amount equal to the liquidation values stated; and, by an additional $24,000 in adequate protection payments made through July 1986 pursuant to the stipulation. Total calculation using Debtor's figures is:

| | |
|---|---|
| Secured debt before liquidation | $369,000 |
| less proceeds paid in liquidation | (220,000) |
| Secured Debt after liquidation | 149,000 |
| less adequate protection payments through July 1987 | (24,000) |
| Present secured debt | 125,000 |
| Unsecured Debt | 352,349 |
| Total Debt | $447,349 |

The total debt figure is not stated in Exhibit H or anywhere else in the Disclosure Statement. Exhibit H, which provides the only analysis of PCA's debt, is unintelligible without a thorough review of the entire Court file as it pertains to PCA and the Debtor. The Exhibit is incomplete, vague, inconsistent and contradictory. The stated figure is presumably the amount that the Debtor claims the debt to be.

k. This figure was calculated without application of a payment due on December 1, 1986. The Debtor and Deere entered into a stipulation filed on December 12, 1985, approved by the Court on December 5, 1985, wherein the parties agreed that the debt owing Deere was $13,392. It was to be paid in three annual installments of $5,051, commencing December 1, 1985, and continuing on or before the first day of December each year thereafter until paid. The payment schedule included interest at 12.5 percent.

l. These taxes were paid on November 18, 1986. Although the debt was originally scheduled at $9,414, apparently the Big Stone County Auditor accepted the $9,020 in satisfaction of the obligation. The amount had been disputed by the Debtor. The obligation was satisfied out of the net 1986 crop proceeds, which, before payment, was calculated by the Debtor at $135,089.

m. Operation expenses for 1986 have already been deducted by the Debtor in its calculation of the value of the 1986 crop inventory. The Debtor's proposed Plan payment schedule shows only $14,000.00 to be paid as an administrative expense. That amount is solely for attorney's fees to Debtor's and the Unsecured Creditors Committee's attorneys. The figures are understated. Additionally, post-petition real estate taxes are treated as a § 507(a)(7) priority claim. However, to the extent that the taxes were assessed after filing, they are administrative expense claims, not § 507(a)(7) priority claims.