**In re DAKOTA RAIL, INC., Debtor.**

**Bankruptcy No. 4–88–639.**

United States Bankruptcy Court,
D. Minnesota.

Aug. 4, 1989.

William J. Joanis, David Bergquist, Hart, Bruner & O'Brien, Minneapolis, Minn., for debtor.

Kim Anderson, Minneapolis, Minn., for trustee.

## MEMORANDUM ORDER DENYING APPROVAL OF DISCLOSURE STATEMENT

NANCY C. DREHER, Bankruptcy Judge.

The above entitled matter came on for hearing seeking approval of a Disclosure Statement filed on June 30, 1989 by Jerome A. Ross, the sole shareholder of the debtor; two partnerships, Sisseton Line Associates and Little Crow Partnership, of which Mr. Ross is a partner; and two unsecured creditors, Anderson Interiors, Inc. and Jerabek Machine Shop ("the proponents"). Appearances were as follows: William Joanis and David Bergquist for the Proponents; Kim Anderson for the Trustee; Sherry A. Enzler for the Minnesota Department of Transportation; and Clinton Cutler for Itel Corp., the successor in interest to Rex Leasing. The court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

### FACTS

#### A. Procedural History

The debtor is a South Dakota corporation formed in 1982. Jerome Ross, one of the proponents of the Plan, is the sole shareholder of debtor. Mr. Ross is also an unsecured creditor, both by reason of the fact that he claims to be owed approximately $30,000.00 by the debtor and also by reason of the fact that he has purchased approximately $140,000.00 of the unsecured claims filed by others in this case. Until March 28, 1989, when his services were terminated by the trustee appointed in this chapter 11 railroad reorganization, Mr. Ross was the President and Chief Executive Officer of the Debtor.

According to the Disclosure Statement, Sisseton Line Associates, another plan proponent, is a general unsecured creditor owed past due equipment lease payments amounting to approximately $400,000.00 and an administrative expense of $34,612.00. Further according to the Disclosure Statement, Little Crow Partnership is a general unsecured creditor owed $6,270.41 on a pre-petition note issued to the debtor, $22,496.19 in pre-petition equipment lease payments, and a priority claim for post petition equipment lease payments of $10,829.19.

Debtor holds an Interstate Commerce Commission permit to operate as a common carrier by railroad. Since late 1985, debtor has been in the business of operating a short line railroad 43.66 miles in length between Wayzata and Hutchinson, Minnesota. Debtor purchased the track, adjacent properties and miscellaneous personal property from the Burlington Northern Railroad Company pursuant to a Purchase Agreement dated August 20, 1985. Burlington Northern had abandoned the line shortly prior to purchase. Under the terms of the Purchase Agreement, debtor agreed to pay the Burlington Northern a total purchase price of $2,090,000.00. The Contract for Deed, dated November 27, 1985 contained extremely liberal payment terms. Debtor's only obligation was to pay $100.00 at the closing and the remainder of principal, with no interest accruing, in five equal $100.00 installments due and payable on the first five successive anniversary dates of the execution of the Contract for Deed, until November 19, 1990, at which time the $2,089,400.00 remaining principal balance would become due and payable. The Contract for Deed further obligated debtor to pay all real estate taxes in the year 1985 and thereafter.

Following the purchase, Ross, his wife, and his adult children operated the rail-

road. The line serves principally two major shippers, Minnesota Mining and Manufacturing and Butler Manufacturing Company (Lester's). Debtor also for a time operated a dinner train. Because of continuing operating losses, the debtor discontinued dinner train operations during the bankruptcy proceedings.

At the time of purchase the railroad line was in need of substantial repair. On May 28, 1986 the debtor entered into an agreement with the State of Minnesota (Department of Transportation) and the Central Prairie Shippers Association, *Phase One Rail Line Rehabilitation of Dakota Rail,* pursuant to which Debtor received $314,088.00 from a federal grant administered by the Minnesota Department of Transportation and $44,870.00 by way of loan from the Central Prairie Shippers Association to be repaid (without interest) at the rate of $50.00 per freight car load shipped. Debtor was to match this infusion of capital by way of $89,739.00 in labor and material.

Debtor's railroad operations have consistently lost money. Between September 1985 and February 1988 the debtor incurred debt of approximately $764,600.00, or approximately $26,000.00 per month. For the year ending June 30, 1987, it sustained an operating loss of $452,189.00 and, at December 31, 1988, it showed a net operating loss of $125,232.00 for the first six months of fiscal year 1989. The dinner train has been an abysmal business failure. Debtor had sustained itself with the income from leases on the various parcels of adjacent properties purchased from Burlington Northern, occasional sales of certain of those properties, and the infusion of capital described above. Nonetheless, debtor's plight remained serious and debtor fell behind on its obligations to Burlington Northern to pay real estate taxes on the properties as they came due.

At the date of filing for relief under chapter 11 of the Bankruptcy Code, February 11, 1988, debtor owed Burlington Northern the unpaid principal balance on the Contract for Deed in the amount of $2,089,700.00. It had also failed to pay real estate taxes as they came due. At the date of filing, after setoffs, debtor owed Burlington Northern the sum of $156,611.39, in addition to the principal amount on the Contract for Deed. The bankruptcy filing was precipitated when negotiations with Burlington Northern broke down and Burlington Northern threatened to foreclose.

Shortly following the filing of the petition for relief, pursuant to 11 U.S.C. § 1163, this court appointed Thomas Lovett as trustee. Lovett has overseen the day to day operations of debtor since his appointment, with Ross and his family members operating the railroad on a day to day basis. On March 28, 1989, Lovett terminated Ross's services as CEO, but he has been retained as a consultant to assist the court appointed trustee in selling real property for the debtor.

During the bankruptcy proceedings, the trustee negotiated a complex refinancing of the debt to Burlington Northern. Pursuant to that refinancing agreement, Burlington Northern agreed to accept the sum of $1,350,000.00 in full satisfaction of the debts owed to it. The funds to pay Burlington Northern and an additional loan for operating expenses were contributed by debtor's two major shippers (3M and Lester's), the McLeod County Regional Rail Authority, and the State of Minnesota Department of Transportation. Pursuant to the refinancing package, debtor sold its interest in the line and its properties adjacent to it to the McLeod County Regional Railroad Authority. Concurrently therewith, the Authority repaid the reduced debt to Burlington Northern. The Rail Authority then mortgaged five adjacent properties to 3M and Butler to secure their $400,000.00 commitment to the refinancing; eighteen adjacent properties are mortgaged by the Regional Rail Authority to the debtor to cover a note of $550,000.00. Debtor is repurchasing the remaining parcels from the Regional Rail Authority under a long term Contract for Deed for a purchase price of $1,350,000.00. Debtor is prohibited from selling the mortgaged properties below certain release prices; at least 80 percent of the proceeds from the sales of such properties must be used to pay costs of

reorganization and creditors, rather than current operating expenses.

The trustee is currently negotiating another financing package for the railroad, the proceeds of which will be used to upgrade and repair additional sections of the railroad line. This financing package, referred to as *Phase Two Rail Line Rehabilitation of Dakota Rail*, is expected to provide approximately $600,000.00 in federal funds (again administered through the Minnesota Department of Transportation), $100,000.00 in funds from the Central Prairie Shippers Association (to be paid again out of a surcharge on each load of freight hauled), and approximately $140,000.00 from the State of Minnesota. Again, debtor will be required to match these funds with its own infusion of labor and materials in the sum of approximately $200,000.00.

## B. The Plan and Disclosure Statement

The plan and disclosure statement at issue have had a tortured history. Ross, as President of the Debtor, but without the authority of the trustee, first filed a Plan and Disclosure Statement in November of 1988. The trustee objected on numerous grounds, including his contention that Ross was required to, but had not, secured the authority of the trustee to file any such plan and disclosure statement on behalf of the debtor. The hearing on that disclosure statement was adjourned indefinitely to allow the parties to attempt to negotiate their differences. Then, after unsuccessfully taking steps to have this court appoint an equity security holders committee (there being only one shareholder), Ross took the route of filing a Plan and Disclosure Statement as a single creditor. The Plan and Disclosure Statement under consideration are the successors to his single proponent filings made in February of 1989. The additional proponents of the Plan joined in on the later amendments.

The Disclosure Statement and Plan under consideration have been amended three times. Each version has drawn strong opposition. Over the continuing objections of the trustee, the United States Trustee, a major creditor (Itel), and the Minnesota Department of Transportation, the court is now being asked to approve distribution of the proponents' "REVISED THIRD AMENDED DISCLOSURE STATEMENT" dated June 13, 1989, and filed June 30, 1989 ("the disclosure statement").

The disclosure statement is 22 pages in length. It contains 16 voluminous exhibits. It suffers in clarity from many amendments and revisions.

Under the proponents' plan, the debtor's secured creditors (Minnesota Mining and Manufacturing, Butler Manufacturing Company, and the Rural Railroad Authority) will be paid in accordance with the terms and conditions of the agreements entered into in connection with the 1988 refinancing. Unsecured creditors with claims of less than $10,000.00, will be paid in full within 30 days of plan confirmation. Unsecured creditors with claims of more than $10,000.00 will be issued promissory notes representing the full amount of their allowed claims plus interest at the rate of 6% per annum from the date of filing of the petition for relief. Alternatively, in lieu of taking a note, members of this class may elect to receive 65% of their allowed claim in cash within 30 days of the confirmation or to receive payment in cash of the lesser of the amount of their allowed claim or $10,000.00. The promissory note to be issued to claimants bears an outside principal due date of January 1, 1994 (anticipated to be four and one-half years after confirmation). The indebtedness is secured by the eighteen properties previously mortgaged by the McLeod County Regional Rail Authority and the stock in the debtor, all of which is and will continue to be owned by Jerome Ross. The plan anticipates that the proceeds of the sales from the described properties will be the source of the funds with which to pay the notes. Under the proposal as made, however, the debtor has no obligation to sell any properties at any time before January 1, 1994.

The disclosure statement indicates that there are $945,973.75 in unsecured claims. Of that amount $449,239.62 is a hotly disputed claim by Sisseton Line Associates (disputed by the trustee, but not by the

142

proponents who make the claim); $39,-
615.79 is another hotly disputed claim by
Little Crow Partnership (again disputed by
the trustee, but not by the proponents who
make the claim). Of the ·total estimated
claims, the disclosure statement indicates
that there are, thus, $327,285.58 in unse-
cured claims not owned or controlled direct-
ly or indirectly by Ross.

## DISCUSSION

### A. Controlling Legal Principles

█ The primary purpose of a disclosure
statement is to give creditors information
necessary to decide whether to accept the
plan. *In re Monnier Bros.*, 755 F.2d 1336,
1342 (8th Cir.1985). Section 1125(b) of the
Bankruptcy Code provides that:

(b) *An acceptance or rejection of a
plan may not be solicited* after the com-
mencement of the case under this title
from a holder of a claim or interest with
respect to such claim or interest, *unless,
at the time of or before such solicita-
tion, there is transmitted to such hold-
er the plan or a summary of the plan,
and a written disclosure statement* ap-
proved, after notice and a hearing, by the
court as *containing adequate informa-
tion.* The court may approve a disclo-
sure statement without a valuation of the
debtor or an appraisal of the debtor's
assets.

*Id.* (Emphasis supplied).

"Adequate information" is defined in 11
U.S.C. § 1125(a)(1) to mean:

... *information of a kind, and in suffi-
cient detail,* as far as is reasonably prac-
ticable in light of the nature and history
of the debtor and the condition of the
debtor's books and records, *that would
enable a hypothetical reasonable inves-
tor typical of holders of claims or inter-
ests of the relevant class to make an
informed judgment about the plan,* but
adequate information need not include
such information about any other possi-
ble or proposed plan.

*Id.* (Emphasis supplied).

█ The following is a nonexclusive and
nonexhaustive list of types of information
that should be included in a disclosure
statement:

1. The circumstances that gave rise to
the filing of the bankruptcy petition;

2. A complete description of the avail-
able assets and their value;

3. The anticipated future of the debtor;

4. The source of the information provid-
ed in the disclosure statement;

5. A disclaimer, which typically indi-
cates that no statements of information
concerning the debtor or its assets or secu-
rities are authorized, other than those set
forth in the disclosure statement;

6. The condition and performance of the
debtor while in chapter 11;

7. Information regarding claims against
the estate;

8. A liquidation analysis setting forth
the estimated return that creditors would
receive under chapter 7;

9. The accounting and valuation meth-
ods used to produce the financial informa-
tion in the disclosure statement;

10. Information regarding the future
management of the debtor, including the
amount of compensation to be paid to any
insiders, directors, and/or officers of the
debtor;

11. A summary of the plan of reorgani-
zation;

12. An estimate of all administrative ex-
penses, including attorneys' fees and ac-
countants' fees;

13. The collectibility of any accounts re-
ceivable;

14. Any financial information, valua-
tions or *pro forma* projections that would
be relevant to creditors' determinations of
whether to accept or reject the plan;

15. Information relevant to the risks be-
ing taken by the creditors and interest
holders;

16. The actual or projected value that
can be obtained from avoidable transfers;

17. The existence, likelihood and possi-
ble success of nonbankruptcy litigation;

18. The tax consequences of the plan;

and

19. The relationship of the debtor with affiliates. *E.g., In re Scioto Valley Mortgage Co.,* 88 B.R. 168, 170–71 (Bkrtcy.S.D. Ohio 1988), and cases cited therein.

Disclosure of all the aforementioned information is not necessary in every case. Conversely, the list is not exhaustive; and a case may arise in which disclosure of all the foregoing type of information is still not sufficient to provide adequate information upon which the holders of claims of interest may evaluate a plan.

*Id.* at p. 171.

█ The statutory definition of "adequate information" leaves the bankruptcy court wide discretion to determine on a case by case basis whether a disclosure statement contains adequate information, without burdensome, unnecessary, and cumbersome detail. *See In re Texas Extrusion Corp.,* 844 F.2d 1142, 1157 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988); *see In re Snyder,* 56 B.R. 1007, 1008 (N.D.Ind.1986). In ruling on a disclosure statement, however, the bankruptcy court must distinguish between 1) whether the disclosure statement contains adequate information to allow the typical creditor to make an informed decision on how to vote, and 2) whether the Plan can be confirmed. Only where the disclosure statement *on its face* relates to a plan that cannot be confirmed does the court have an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of the plan; otherwise, confirmation issues are left for later consideration. *In re Pecht,* 57 B.R. 137, 139 (Bkrtcy.E.D.Va.1986). Allowing a facially nonconfirmable plan to accompany a disclosure statement is both inadequate disclosure and a misrepresentation. *Id.*

## B. Objections to Disclosure Statement

Originally the Disclosure Statement drew objections from the United States Trustee, the Chapter 11 trustee, the State of Minnesota Department of Transportation, and Itel, which (if the claim of Sisseton Associates is ignored) is the debtor's largest creditor, holding a claim of $103,333.00. The objections of the United States Trustee, largely technical in nature, have been or will be satisfied by further amendments to the Plan and Disclosure Statement. Some of the objections of the other objectors have, it is agreed, been adequately responded to or are issues properly raised at a confirmation hearing.[1] The court will separately address those objections which remain at issue.

1. Trustee's Objection 1: Absolute Priority

█ The trustee asserts that the plan, on its face, does not meet the absolute priority rule and is, therefore, on its face not susceptible to confirmation. Specifically, the trustee points out that the plan provides that unsecured creditors will receive payment of the claims in unspecified amounts and at unspecified times, with interest at 6% per annum while Ross will retain his ownership interest in the debtor. The trustee thus urges that the proposed arrangement fails to provide unsecured creditors with property of a value, as of the effective date of the plan, equal to the amount of their unsecured claims as required under 11 U.S.C. § 1129(b)(2)(B)(i), or to satisfy the requirements of 11 U.S.C. § 1129(b)(2)(B)(ii). *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 966–70, 99 L.Ed.2d 169 (1988).

The proponents respond that the 6% interest rate is appropriate, that under the

---

**1.** At the hearing the trustee's counsel advised the court that the following objections had either been responded to or were admittedly confirmation matters: Objection 4, that portion of Objection 5 which refers to the technical description of the State of Minnesota's position regarding *Phase Two,* Objection 9, Objection 10, Objection 11, Objection 13, and Objection 14. The State of Minnesota has joined in the trustee's objections, and to the same extent continues to press all of the trustee's objections, but for those mentioned. The State of Minnesota also asserted its own separate objections, Numbered 2 through 5. The proponents have modified the language of the disclosure statement to meet Objections 2 and 3. The fourth and fifth objections remain in dispute. Itel has asserted four separate objections, none of which, in its view, have been adequately responded to by the proponents.

plan the creditors will receive 100% of their claims, and that creditors also have the option of receiving 65% of their claim within 30 days of confirmation. Furthermore, they assert, Ross has agreed to give up his shares should the creditors not receive the payment assured, and to subordinate his claims, those of Sisseton Lines Associates and Little Crow Partnership, and all the claims that he has or will purchase. As such, he asserts, the absolute priority rule will be met.

The court believes that, while there may be significant doubt as to whether the plan can be confirmed as proposed, this is not a facial deficiency. It is premature to prejudge this issue, since it may not arise, in any event. It is an issue to be addressed at confirmation.

2. Trustee's Objections 2, 5, and 12; Itel Objection 2; and State Objection 5: Disclosures relating to the manner in which the Unsecured Creditors will be paid, the timetable therefor, and the Phase Two funding

■ The Trustee asserts that the plan is facially not susceptible to confirmation because there is no formal appraisal of the properties which will be sold to pay the unsecured creditors, and there is no timetable for sale of particular properties. He also asserts that *Phase Two* financing will not occur if the proponents' plan is confirmed and the disclosure statement is misleading in failing to make this clear. Finally, it is misleading to suggest, without support, that debtor could be viable without the infusion of capital from *Phase Two*. In a related objection, Itel asserts that the disclosures with respect to how the unsecured creditors will be paid are inadequate in failing to specify a date for payment or events of default that would allow a creditor to resort to the collateral prior to January 1, 1994, whether Ross will share in the payments, what properties will be sold to provide funds for payment of the promissory notes, and which of the properties are necessary to the continuing operations of the railroad. The State, in a further relat-

ed objection, asserts that the disclosure statement fails to make the state's position on *Phase Two* financing clear; creditors should be told that *Phase Two* is contrary to the state's position, and, at the very least, what it will cost to maintain the railroad without *Phase Two* and the source of such financing.

The valuation of the properties to be sold has been adequately disclosed. The valuations contained in the disclosure statement are based on informal opinions of value prepared by a real estate agent of some experience in the area. His advice was originally solicited by the trustee. While technically not formal appraisals, the court believes that these informal opinions of value adequately disclose the anticipated selling price for the parcels of property which will serve as security for the notes. A formal appraisal of the debtor's properties is not required to meet the test of adequate disclosure. *See* 11 U.S.C. § 1125(b).[2]

Furthermore, the disclosure statement adequately discloses the properties which will secure the commitment on the notes, the timing of those sales, whether Ross will share in the proceeds of sales, and the events of default that will trigger a requirement for full payment. The disclosure statement and the promissory note appended as an exhibit thereto reflect clearly that the debtor (which will be managed by Ross) has no obligation to sell any of the properties under any timetable other than that the drop dead date of January 1, 1994. It is clear from the disclosures, taken as a whole, that the commitment to pay prior to January 1, 1994 is open-ended, confined only by an obligation to pay proceeds of the properties to the holders of the notes; in fact, under the disclosures, the debtor could sell properties and not pay the holders until January 1, 1994, so long as the proceeds of sales are retained for the noteholders. In other words, under the disclosures given to the creditors it is clear that Ross maintains complete discretion to do as he wishes with

2. Objection 12 by the trustee asserts that it is misleading to refer to any "appraisal value" of

these properties. I agree.

the properties; he is buying another four and one-half years to hold his unsecured creditors off, with no commitment on his part to pay them prior thereto. This may be a bad deal, but it is not inadequate disclosure.

■ The remaining objections are, however, well-taken when they assert that the disclosure statement is facially deficient in proposing a plan that is contrary to the State's position regarding *Phase Two.* The Minnesota Department of Transportation has filed a position statement (which at its request has been appended as an exhibit to the disclosure statement) in which it takes the position that "Dakota Rail's realistically projected revenues from its rail/freight and lease payments cannot, in the foreseeable future, pay normal operating costs and service old debt. *Until sufficient assets have been sold to pay all debt and provide for a substantial reserve fund no plan of reorganization should be confirmed.*" While asserting that the state's "primary objective" is to "promote the strong public interest in adequate rail service to the area served by the line," the statement sets forth minimal provisions which any plan of reorganization *"must contain, ... if the public's interest is to be protected."* These include preconfirmation payment of all prepetition debt, payment of the debts to Minnesota Mining and Manufacturing and to Butler Manufacturing, the establishment of a $200,000.00 reserve for emergency maintenance and repair, and significant modification of the 1988 refinancing arrangements so to impose financial and other operational controls on the debtor. At the hearing, upon questioning by the court, the trustee asserted that unless the limitations outlined in the position paper were agreed to and made a part of the Plan, the State of Minnesota would not go forward with *Phase Two.* In response to the court's specific inquiries to the State, the State took the position that it was "seriously concerned" about the proponents' plan, unhappy with the proponents' desire to formulate a plan before there was any reason to believe with confidence that the debtor could survive, and very unhappy that the proponents have gone forward with a plan

and disclosure statement which does not satisfy the State's minimal requirements. Based on these representations, I believe that it is reasonable to conclude that the State of Minnesota will not provide the funding for *Phase Two* if the proponents' plan or anything vaguely resembling it is confirmed. The court further believes and concludes that, in spite of the proponents' protests to the contrary, the railroad definitely needs the money to continue. That is certainly the position of the court-appointed trustee, who asserts that *Phase Two* is vital to keep the line maintained in workable order in the near term. Thus, this is a proposed plan which cannot succeed without an infusion of capital; that capital infusion will not be available if the plan is confirmed. A clearer case of a facially defective disclosure statement could hardly be found. The fact is that vital funding for the continuing operations of the debtor will not be available if the proponents' plan is confirmed. That alone should be enough to end this disclosure statement's thus far tortured life. *See In re Unichem,* 72 B.R. 95, 97 (Bktcy.N.D.Ill.), *aff'd,* 80 B.R. 448 (N.D.Ill.1987) (disclosure statement did not contain adequate information where proponent's cash infusion to debtor's estate was illusory).

3. Trustee's Objections 3, 7 and 15: Misleading information on the claims of Sisseton Line Associates and Little Crow Partnership

The objectors further contend that the disclosure statement should not be approved because it misrepresents the claims of Sisseton Line Associates and Little Crow Partnership. This too is a fatal defect.

The disclosure statement represents that a significant portion of equipment scheduled as belonging to debtor actually belongs to Sisseton Line Associates and Little Crow Partnership. As previously noted, it further reflects that Sisseton Line Associates and Little Crow Partnership are owed approximately $475,000.00 in past due pre- and postpetition rentals for this equipment.

The claim that Sisseton and Little Crow own the equipment of the debtor is a late

emerging one. These claims are not carried on the books and records of debtor, were not scheduled in the bankruptcy petition when filed and were not disclosed in previous disclosure statements. Rather, the earliest version of this disclosure statement represented that:

> Dakota Rail owns all of its equipment both to build, improve, and operate the railroad. The only encumbrance being a security interest held by Jackson Jordon in the amount of $21,000. Dakota Rail recently paid in full debt secured by an interest in its equipment (with a principal value of $90,000) through sale of property in Milbank, South Dakota. The book value of Dakota Rail's nonencumbered equipment is $592,000.

*Disclosure Statement*, dated November 8, 1988, at 6.

The current disclosure statement, however, has been substantially modified. It now reads as follows:

> Dakota Rail owns two locomotives, a tie handler, a tie crane, a Jordon spreader, and other miscellaneous equipment. Dakota Rail recently paid in full debt secured by an interest in its equipment (with a principal value of approximately $90,000) through sale of property in Milbank, South Dakota. The book value of Dakota Rail's nonencumbered equipment is $592,000. A security interest held by Jackson Jordon in the amount of $21,000 has been paid.
>
> Mr. Ross and a limited partnership in which he is the sole general partner, Sisseton Line Associates ("Sisseton"), assert that they are the legal owners of the equipment indicated in the list which is attached as Exhibit H. Sisseton is owed $414,627.62 for equipment leases from 1985 through the present. It is expected that the Trustee does not agree with that position. If necessary, Sisseton is willing to extinguish the debt in exchange for the return of its property. The partnership is also willing to lease necessary operating equipment to Dakota Rail for $1.00 per month, while Dakota Rail maintains obligations to its Creditors under the Plan, provided that Dakota Rail agrees to contract with Sisseton for the same equipment "necessary for Dakota Rail's operation" at fair market value for the ten years following final payment to Creditors under the Plan. If necessary, Mr. Ross will initiate an adversary proceeding in bankruptcy court to determine the ownership of this equipment.

*Revised Third Amended Disclosure Statement*, dated June 13, 1989, at 11. Exhibit H to the Disclosure Statement, referred to in the above quote, is a list of equipment owned by Sisseton Line Associates as of 1986 as well as considerable documentation tending to establish that Sisseton Line Associates did originally purchase the equipment. That equipment apparently includes the dinner train equipment (except engines) and various other items such as snow plows, cars, jacks and generators. Also included in Exhibit H is the as yet unfiled (or perhaps now late filed) claim by Sisseton for over $400,000.00 and demand letters dated June 1989 from Ross to the trustee for claims to lease payments by Sisseton and Little Crow.

It is significant to note that all of the equipment of which ownership is now in dispute was originally scheduled as owned by the debtor at the time the petition was filed, that neither Sisseton nor Little Crow were listed as creditors in the original petition, and that no written lease was written between debtor and Sisseton. Apparently the only written proof of the current claims are a promissory note (claimed to be held by Little Crow in the amount of $5,000.00) and a lease between Little Crow (but not Sisseton) and the debtor. Because the trustee had earlier asked for and not received any written documentation of these claims, the late nature of the now asserted ownership position, and other fairly suspicious circumstances, the trustee states that he believes that no written documentation of *any* of these claims existed prior to the filing. He suggests, therefore, that Ross has fabricated the written documentation on Little Crow's claim and fabricated or grossly exaggerated the current claims of both partnerships.

The proponents argue that there is nothing inaccurate in their claims. They assert

that the equipment has always been owned by Sisseton and Little Crow. The lease arrangements were entered into, but not carried on the books and records of debtor, they say, to avoid taxes. They also assert that these claims were withheld at an earlier point in time in the bankruptcy, even though they were believed to be valid, so as to keep matters quiet while debtor tried to extricate itself from bankruptcy. Since Jerome Ross owns all the entities and since his real goal has been to use bankruptcy only as a tool to stave off Burlington Northern (that goal now having been accomplished), he argues that there was nothing unusual or misleading in his failing to earlier make these claims. Most significantly, however, he argues that the entire issue of who owns this particular equipment is irrelevant, because Sisseton and Little Crow have offered to subordinate their claims to those of the other secured creditors. Since the plan and disclosure statement fully disclose the dispute over the equipment, the proponents see no harm in the manner in which they deal with this disputed equipment.

The court believes that the proponents' assertions in this regard completely miss the mark. The point is that for the first time in a bankruptcy case which is now nearly 18 months old the proponents of this plan claim to own a substantial amount of the equipment necessary to operate the debtor should it continue operations, as proponents propose. They do so under questionable circumstances. In arguments before this court, but not in the plan and disclosure statement, they admit to having kept books and records of the company which were not accurate, if their current claims have any merit. Disclosing that there is such a dispute does not solve the problems which these new claims create. As counsel for the objectors properly point out, while this dispute over a major segment of the assets rages, there is no way to do an intelligible liquidation analysis; to determine whether creditors can look to this equipment to pay the debts, either in a

liquidation or in case the plan fails; or to determine whether such undisclosed intercompany dealings taint current management so as to render it untrustworthy in future management. The orderly manner to proceed is to resolve this dispute over ownership in the form of an adversary proceeding (which the court will hear on an accelerated schedule should the parties wish). As counsel for the objecting parties assert, until the ownership of these key assets is known, the reorganization cannot proceed on an orderly basis. It certainly cannot proceed based on the disclosure included in this disclosure statement since it does not contain an accurate statement of the debtor's property.[3] Because the knowledge of a debtor's financial condition is essential before any informed decision concerning the merits of a chapter 11 plan can be made, it is vital, if not a prerequisite, that a description of available assets, their value, and certainly their ownership be disclosed under § 1125. *See In re Ligon,* 50 B.R. 127, 130 (Bktcy.M.D.Tenn.1985); *In re Metrocraft Publishing Servs., Inc.,* 39 B.R. 567, 568–69 (Bktrcy.N.D.Ga.1984).

4. Trustee's Objections 6 and 16, State Objection 4: Inadequate disclosure regarding current level of revenues and possibility for future earnings

Debtor has never made money on its railroad operations; rather it has lost extraordinary sums, even when it had little or no debt service. The disclosure statement, nonetheless, contains projections for future operations reflecting net income from operations throughout the plan years. These projections are based on statements by Ross made to debtor's accountants that the railroad will pull 1,000 revenue producing cars during 1989 and that this number will increase at the rate of 5% each year of the plan. The trustee's projections are also included in the disclosure statement. He estimates that the railroad operations will lose approximately $100,000.00 in each of the five years of the plan; his figures are premised on the assumption that the debtor

---

**3.** In railroad reorganizations, § 1129(a)(7) does not apply. Rather, the court applies a modified best interests of the creditors test that takes into

consideration the public interest. 11 U.S.C. §§ 1165, 1173(a)(1), (2), (3), and (4).

148

will pull 855 revenue producing cars in the year 1989 and then adds the same 5% multiplier each year of the plan. The projections of the proponents and the debtor are both contained in Exhibit D. Exhibit I is a letter from Ross to his counsel dated June 11, 1989 purporting to provide the substantiation for his estimated projections. In that letter Ross advises his counsel that it takes 800 revenue cars for debtor to "break even" at an average of $500 per car and that "this amount of traffic along with our leases makes Dakota Rail viable and competitive in the market place." The letter then goes on to state that:

"The following numbers were used in determining our projections:

| SHIPPER | REVENUE CARS |
|---|---|
| Lester's | 250 |
| Pure Culture | 72 |
| 3M | 380 |
| Rock Ballast | 120 |
| Pick Industries | 100 |
| Salt | 5 |
| Scrap Iron | 10 |
| Peas | 1 |
| Fertilizer | 10 |
| Hutchinson Mfg. | 10 |
| Misc. | 42 (brick, oat-hulls, etc.) |
| TOTAL | 1,000 |

The disclosure statement contains the following representation as to current operations of the debtor:

Marketing

DAKR's operations in Minnesota consist of a short line railroad of approximately forty-four miles between Wayzata and Hutchinson, at which point it interchanges with Burlington Northern. DAKR's primary shippers are Lester's of Lester Prairie, Pick Industries of Silver Lake, and Pure Culture and 3M of Hutchinson. DAKR handled 830 cars in 1988, 225 of which were empty but generated revenue of approximately $150 per car round trip from Silver Lake, MN to Wayzata, MN. Upon confirmation of the Plan and as DAKR's railroad line is improved, Mr. Ross believes DAKR will find many new opportunities and shipper in the transportation field. (See Exhibit I.)

*Revised Third Amended Disclosure Statement,* dated June 13, 1989, at 9–11. This text is supported by a lengthy footnote which contains a breakdown of 830 revenue cars pulled in 1988, the same projected breakdown of 1989 revenue cars (Exhibit I) and a repeat of the statement that it takes only approximately 800 revenue cars at an average of $500.00 per car for the debtor to break even.

The trustee and the State of Minnesota assert that the disclosure statement is misleading in its projections of 1,000 revenue producing cars in 1989 because currently in 1989, its annualized figure is only 850 cars. Most troublesome, the trustee and the State of Minnesota assert, is the fact that 150 of the 1,000 projected revenue cars are not revenue producing at all, but instead are cars containing rock ballast and other materials that the debtor will be required to haul at its own expense in connection with the upgrading work to be done in *Phase Two,* if approved. *Phase Two* is in jeopardy if this plan in confirmed; also every one of these cars will represent an expense, not revenue to the debtor. The trustee also asserts that Ross's statement that the line can break even at 1,000 cars paying $500.00 per car is unsubstantiated and seriously misleading. There is nothing in the disclosure statement to substantiate Ross's anticipated 1,000 revenue cars (and indeed the suggested basis is misleading, he asserts) and there is nothing to support the inference that debtor's revenue producing cars do (or can) produce $500.00 per car.

I agree that it is misleading to suggest that the debtor will break even on its railroad operations in 1989 and thereafter using the bases given in the disclosure statement. It is certainly misleading to suggest that approximately 15% of the projected 1989 cars are revenue producing; to the contrary they are not revenue producing at all, but are instead a burden on the debtor. It is further misleading to suggest that there will be 1,000 revenue producing cars this year when current year to date figures annualized are well below that. The statement of Ross that once the debtor emerges from bankruptcy, business will pick up, is

wholly unsubstantiated. And, without some suggestion that the average revenue production is, in fact, $500.00 (something that the proponents do not choose to and apparently cannot substantiate), use of such a figure is also misleading.

The overall impact of the text of the disclosure statement, Exhibit D (debtor's projections) and Exhibit I (Ross's letter regarding 1989 anticipated revenue producing cars) is to leave the reader with the impression that there is an anticipated "break even" point in these operations in the very near future. That would certainly be material to unsecured creditors waiting to get paid on their notes. In fact, at the hearing and throughout these proceedings, the one point of noncontention is that debtor cannot make money to pay its creditors out of current operations, either in the past, present, or the foreseeable future. It has to sell its properties to pay off its prepetition creditors and to pay the debt it incurred in connection with the 1988 refinancing. A disclosure statement is misleading where it contains glowing opinions or projections, having little or no basis in fact and/or contradicted by known fact. *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bktrcy.N.D.N.Y.1988) (court is reluctant to approve a disclosure statement premised upon unsupported and self-serving valuations); *In re Civitella*, 15 B.R. 206, 208 (Bktcy.E.D.Pa.1981) (mere allegations or opinions unsupported by factual information in the disclosure statement do not meet the standard of adequate information); *Cf. In re Snyder*, 56 B.R. 1007, 1013 (N.D.Ind.1986) (disclosure statement not misleading where it does not hold out a promise of distributions under the proposed plan and it paints a bleak picture of debtor's estate). While management is certainly entitled to its view that operations are likely to improve, it cannot represent to its creditors that they will necessarily do so when all historical facts and its own admissions during the proceedings belie that fact.

Thus, in the overall, these portions of the disclosure statement are misleading and materially so.

5. Trustee's Objections 8 and 17; Pending litigation

The trustee also asserts that it is misleading to state, as the disclosure statement does, that the debtor will receive $50,000.00 in the form of proceeds of settlement of litigation arising out of an accident. I agree.

The path of all litigation tends to be uncertain, and the documentation appended as Exhibit L to the disclosure statement suggests that this accident is no exception. The issue of liability is in litigation. If anything, Exhibit L suggests that liability is being vigorously defended by the party from whom the proponents assert the debtor will necessarily receive a settlement sum of $50,000.00.

6. Itel's Objection 1: Misclassification of the Dinner Train Creditors.

Itel objects to the manner in which the disclosure statement describes and treats the claims of creditors who provided services in connection with the dinner train operations, Sisseton's claim to equipment, and the proposed transfer of equipment Sisseton claims to own. The proponents respond that Sisseton owned the dinner train equipment and creditors providing services to that equipment were to be paid by Sisseton from lease payments debtor never made. It is on this basis that the proponents propose to specially treat the dinner train creditors by paying them in full within 30 days of the confirmation.[4] It is also on the basis of the purported agreement between Sisseton and the debtor that debtor proposes to exchange the equipment in lieu of the outstanding lease payments, an arrangement to which Itel objects, at least without further examination and disclosure with respect to the underlying claim.

While framed somewhat differently, these objections are similar to those made by the trustee and the State and discussed in Item 2 above. Until there is a factual resolution as to validity of the claims of Sisseton Line Associates, the objections of Itel are well-taken.

4. Jerome Ross has purchased most of these     claims.

#### 7. Itel's Objections 3 and 4: General Disorganization

In these, the final objections which have been raised, Itel asserts that the disclosure statement is misleading because it fails to put in comprehensible form, clearly and in plain English, what this plan is really about; i.e., to put in one place the debtor's assets, liabilities, types and amounts of claims, and some clear general description of what the debtor will really be responsible to do in connection with the proposed plan. As Itel states, because of the format adopted by the proponents, "It is almost impossible for a creditor to pull together, in a reasonable period of time, any meaningful information." Itel suggests that the Disclosure Statement format be revised to communicate to general creditors "what the Debtor owns, what the property is worth, what claims exist, and how Debtor proposes to operate profitably to pay its obligations to creditors."

To a certain extent, the court agrees with this objection. The disclosure statement is very difficult to follow. The business of the debtor is not that complicated and one would not have expected the disclosure statement to be so murky. It *is* difficult to determine what a liquidation of the estate would produce; because of the many, varied, and voluminous exhibits it takes more than a common understanding of the English language to try to determine what actually might happen.

In certain respects, the problems with this disclosure statement parallel the comments by Judge O'Brien in *In re Haukos Farms, Inc.*, 68 B.R. 428 (Bktcy.D.Minn. 1986) where he noted that:

> The Court found it necessary to expend in excess of two full days thoroughly reviewing the entire Court file in this case. Rather than facilitating the Court's understanding of Debtor's financial circumstances and relationship with creditors, the Third Amended Disclosure Statement impeded it.

\* \* \* \* \* \*

The Third Amended Disclosure Statement standing alone is, for the most part, unintelligible.

*Id.* at 434.

Perhaps there will come a time when an objection such as this, which I will refer to as the Plain English Disclosure Statement Rule, will be adopted.[5] For the moment, however, I need not go so far as to deny approval of this disclosure statement based on this argument alone; because the disclosure statement process has gone so far, I would not be inclined to do so in any event. This disclosure statement would probably not fail for this reason alone; it fails for many other reasons previously described.

For the foregoing reasons, IT IS HEREBY ORDERED THAT:

The REVISED THIRD AMENDED PLAN AND DISCLOSURE STATEMENT dated June 13, 1989 filed by Proponents Jerome Ross, Sisseton Line Associates, Little Crow Partnership, Anderson Interiors, Inc., and Jerabek Machine Shop is not approved. The objections of the trustee, the State of Minnesota, and Itel, to the extent noted in this Memorandum Order, are sustained.

---

**5.** Judge O'Brien apparently had the same idea when he proposed that "an appropriate test on appeal of the adequacy issue might be whether an appellate court can understand these matters upon review of the document without review of the file or the appendix to this opinion. *Haukos Farms,* 68 B.R. 434 n. 3.