### In re UNICHEM CORPORATION, Debtor.

No. 83 B 13763.

United States Bankruptcy Court, N.D. Illinois, E.D.

March 30, 1987.

Towbin & Zazove, Ltd., Chicago, Ill., for debtor.

Morris Hass, Chicago, Ill., for the Unsecured Creditors Committee.

Dean C. Harvalis, Chicago, Ill., U.S. Trustee.

Faye B. Finstein, Antonow & Fink, Chicago, Ill., for William Gurtler.

## MEMORANDUM OPINION AND ORDER

ROBERT L. EISEN, Chief Judge.

This matter comes before the court on the debtor's objections to the disclosure statement filed by William Gurtler. The court, having considered the arguments of counsel and memoranda submitted, denies approval of the disclosure statement submitted by Gurtler for the reasons hereinafter set forth.

### Background

Unichem is an Illinois Corporation incorporated in 1969 engaged in the manufacture and distribution of chemical cleaning compounds, with its principal markets being commercial laundries, dry cleaning institutions, and hotels. Unichem's current shareholders are Eugene Korey (25.5%), Nowell Korey (25.5%) and William Gurtler (49%). Eugene Korey is the President of Unichem. Nowell Korey is the Secretary. William Gurtler is Unichem's former President and General Manager.

On November 7, 1983, Unichem filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 et seq.).[1] Since that time, Unichem has continued to operate its business as a debt-

or in possession in accordance with § 1108. Pursuant to §§ 1121 and 1125, Gurtler has submitted a plan of reorganization and disclosure statement.[2] As required by § 1125(b), a hearing was held on Gurtler's disclosure statement on March 3, 1987. At that hearing, both the debtor and the U.S. Trustee voiced serious objections to Gurtler's proposed disclosure statement. The main thrust of the objections raised was that the accompanying proposed plan to the disclosure statement could not legally be confirmed. In other words, if at a hearing on the disclosure statement it is apparent the accompanying plan does not conform to the requirements of § 1129, the court should withhold approval and distribution of the disclosure statement. Additionally, other objections were made based on the lack of adequate information.

### Discussion

Section 1125(b) requires that before acceptance or rejection of a plan may be solicited from creditors, the proponent of a plan must submit a disclosure statement which, after notice and a hearing, must be approved by the court. In order to approve a disclosure statement, the court is obligated to determine that the disclosure statement contains "adequate information." See § 1125(b).

Section 1125(a)(1) defines "adequate information":

(1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan;

---

**1.** All references to statute sections contained herein are to the Bankruptcy Code unless otherwise noted.

**2.** The debtor has previously submitted its own plan and disclosure statement. The debtor's amended disclosure statement was approved by the court and the confirmation hearing on the debtor's plan has been set for April 16, 1987.

Additionally, § 1125(d) provides that whether a disclosure statement contains adequate information is governed solely by the provisions of the Bankruptcy Code. Determination of the adequacy of a disclosure statement, and, therefore, approval of it, is within the sound discretion of the bankruptcy court and is to be determined on a case by case basis. *In re Snyder,* 56 B.R. 1007 (Bankr.N.D.Ind.1986); *In re Medley,* 58 B.R. 255 (Bankr.E.D.Mo.1986). The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan. *In re Ligon,* 50 B.R. 127 (Bankr.M.D.Tenn.1985); *In re William F. Gable Co.,* 10 B.R. 248 (Bankr.N.D.W. Va.1981). *See* Ginsberg, Bankruptcy, ¶ 13,-461 at 13,047–050 (1985).

In the case *sub judice,* the court is faced with the additional issue whether it should approve a disclosure statement when it is clear at the time of the hearing on the disclosure statement that the plan accompanying the disclosure statement can not be confirmed because it does not comply with the requirements of § 1129. Since the court finds that the disclosure statement does not contain adequate information and that the plan does not comply with the requirements of § 1129, it will not approve Gurtler's proposed disclosure statement.

### Adequacy of Information

The court finds that since Gurtler's disclosure statement is illusory and contains many contingencies which are not clearly spelled out, it would be difficult for creditors to make an informed judgment regarding Gurtler's plan. Gurtler's disclosure statement indicates that unsecured creditors can expect to receive approximately $.60 for every dollar of unsecured claim. (The debtor's plan proposes a payment to unsecured creditors of $.12 for every dollar of unsecured claim). However, the disclosure statement does not adequately inform the creditors how conditional that payment is or of the strings Gurtler has attached to it.

The payment of the unsecured claims is proposed to come from a $200,000 cash infusion to the estate by a company to be formed by Gurtler. Basically, Gurtler will be buying the assets of the debtor for $200,000. What the disclosure statement does not adequately disclose is that under certain circumstances, Gurtler would be relieved of his obligation to pay the $200,000. If Gurtler does not pay the $200,000, the debtor would be liquidated and unsecured creditors would receive nothing. The contingencies which would allow Gurtler to back out are numerous. First and foremost, Gurtler's plan requires extensive post-confirmation cooperation from the existing management of the debtor. The court over the last three years has had ample opportunity to witness the acrimonious relationship between Gurtler and the debtor's management. It is unlikely that if Gurtler's plan were approved, current management of the debtor would cooperate with Gurtler, the new owner of the debtor's assets, and the court is without authority to order them to cooperate. Such lack of cooperation would relieve Gurtler of, or allow him to withdraw, his contribution.

In addition, Gurtler owes the debtor approximately $60,000 as a result of a state court judgment (discussed in detail *infra*). Gurtler's disclosure statement is misleading to the extent that it does not adequately disclose that if Gurtler's plan is confirmed, he will not have to pay the judgment. The net result is that Gurtler's offer to purchase the debtor's assets for $200,000 is really only a $140,000 offer since absent Gurtler's plan, he is obligated to pay the debtor $60,000 to satisfy the judgment.[3]

For these and other reasons discussed at the hearing on the disclosure statement on March 3, 1987, Gurtler's disclosure statement does not contain adequate information. If that were its only shortcomings, perhaps the disclosure statement could be amended to meet these objections. However, as discussed below, the court finds as

3. This $60,000 is currently in an escrow account pending the outcome of these proceedings.

a matter of law that under no set of circumstances could Gurtler submit a confirmable plan.

### Good Faith

■ Section 1129(a) provides that a "court shall confirm a plan only if all of the following requirements are met." The section then lists twelve requirements, one of which is "[T]he plan has been proposed in good faith ..." § 1129(a)(3). A bankruptcy court has an independent duty to ascertain that a plan complies with all the requirements of § 1129(a), including the good faith requirement. *In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34 (Bankr.S.D.Ind.1986); *In re Wallace*, 61 B.R. 54 (Bankr.W.D.Ark. 1986).

Although the issue of whether a plan meets the requirements of § 1129(a) is usually reserved for the hearing on confirmation, in certain circumstances it is appropriate for the court to consider the issue at the hearing on the disclosure statement. One such circumstance is where it is readily apparent that the plan accompanying the disclosure statement could never legally be confirmed. *In re Pecht*, 53 B.R. 768 (Bankr.E.D.Va.1985); *In re McCall*, 44 B.R. 242 (Bankr.E.D.Pa.1984). In this case, the court finds that any plan proposed by Gurtler could never meet the good faith requirement of § 1129(a). "Submitting the debtor [or creditor or shareholder] to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would unduly delay any possibility of a successful reorganization." *In re Pecht*, *supra*, at 769–70.

In order to understand why this court finds that Gurtler could never submit a plan that would meet the good faith requirement of § 1129(a), a review of the relationship between Gurtler and the debtor is necessary. Gurtler was the president and a member of the Board of Directors of

Unichem until he resigned on March 12, 1982. Shortly after Gurtler resigned, Unichem brought an action against Gurtler in the Circuit Court of Cook County alleging that Gurtler breached the fiduciary duty he owed to Unichem as an officer and director. The trial court found that as a matter of law Gurtler breached his fiduciary duty to Gurtler and assessed damages of $47,-964.80 plus interest accruing from the date of judgment plus attorneys fees. The judgment was affirmed by the Illinois Court of Appeals in *Unichem v. Gurtler*, 148 Ill.App.3d 284, 101 Ill.Dec. 400, 498 N.E.2d 724 (1986) and the Illinois Supreme Court denied certiorari.

The appellate court stated the facts as follows: [4]

The record reveals that during 1981 Gurtler was president of Unichem and his son, G.B. Gurtler, was Unichem's sole salesman in the Ohio region. In November of 1981, Gurtler contacted his cousin, Lester C. Gurtler, the plant manager at Unichem. Gurtler informed Lester that he was going to leave Unichem soon and encouraged Lester to leave Unichem also. Lester agreed.

During the month of December 1981 Gurtler learned that his son was also going to leave Unichem in the near future. Gurtler further learned that G.B. Gurtler was looking for a building to house a new business which he intended to open after he left Unichem. The new business would produce the same type of goods as that manufactured by Unichem and would compete with Unichem for the same customer base. On December 30, 1981, G.B. Gurtler, on behalf of "Gurtler Chemicals of Illinois" entered into a lease for a warehouse. On January 1, 1982, G.B. Gurtler resigned from Unichem. Although Gurtler was aware that his son was establishing a rival business, he failed to inform any of Unichem's other officers as to those developments.

---

4. As stated by the Seventh Circuit Court of Appeals: "Federal courts may also take judicial notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue." *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir.1983); *See also, In re Silver*, 109 F.Supp. 200, 204 (N.D.Ill.1952) *aff'd, Resser v. Silver (In re Silver)*, 204 F.2d 259 (7th Cir.1953). The state court proceedings have a direct relationship to the matters *sub judice* and are quoted herein at length for that reason.

After January 1, 1982, Gurtler personally approved five separate sales of Unichem goods to G.B. Gurtler. The sales occurred on January 6, 14, 21, 22 and 28, 1982. These sales to G.B. Gurtler were at a price substantially lower than the normal price that Unichem charged its customers. In fact, the price charged to G.B. Gurtler barely covered the cost of producing the material and provided Unichem with only marginal profit. In addition, the sales were made on credit to G.B. Gurtler, who possessed no credit history. Although Gurtler was aware that G.B. Gurtler was obtaining Unichem products for the sole purpose of reselling the goods to Unichem customers (with the profits going to Gurtler Chemicals), Gurtler failed to inform Unichem's other officers of G.B. Gurtler's purchases.

When G.B. Gurtler resigned from Unichem on January 1, 1982, Gurtler did not attempt to notify Unichem's other officers until he sent a memo describing G.B. Gurtler's resignation. While the memo was dated January 25, 1982, the other officers at Unichem did not receive the memo until early March.

On February 9, 1982, Gurtler contacted the First National Bank of Dolton for the purpose of obtaining, and guaranteeing, a $100,000 loan. The proceeds of the loan were not for Gurtler himself, but were instead to be disbursed to G.B. Gurtler. Gurtler used his own residence as collateral for the loan and discussed with the loan officer the type of business that G.B. Gurtler was going in to. Subsequently, on April 9, 1982, the loan was granted and the proceeds deposited into the account of Gurtler Chemicals. Gurtler never disclosed to Unichem's other officers that he was attempting to obtain a loan for the rival business established by his son.

During February of 1982 Gurtler became aware that his wife and G.B. Gurtler were soliciting Unichem employees in an attempt to encourage those employees to leave Unichem and join Gurtler Chemicals. In addition, Gurtler knew that his wife had taken several of Unichem's labels and was using those labels to make Gurtler Chemicals' labels. The Gurtler Chemicals' labels created by Gurtler's wife were duplicates of Unichem's labels. (See section II.) Moreover, Gurtler admitted that he provided "technical input" to his wife while she was developing the labels for Gurtler Chemicals. Gurtler did not inform any of Unichem's other officers as to these developments.

On Friday, March 12, 1982, Gurtler resigned from his position as president and director of Unichem. On Monday, March 15, 1982, Gurtler assumed the position of president and director of Gurtler Chemicals, thereby joining his son and wife in their endeavor. In addition, on that Monday, eight of Unichem's other employees failed to report to work at Unichem and instead became immediately employed with Gurtler Chemicals.

148 Ill.App.3d at 287–88, 101 Ill.Dec. 400, 498 N.E.2d 724. The trial court found that Gurtler breached his fiduciary duty as a matter of law. In affirming the trial court's decision, the appellate court stated:

We believe that with this evidence before it, the trial court could properly find that Gurtler breached the fiduciary duty he owed to Unichem. It is obvious that the conduct set forth above is contrary to the duties of good faith, loyalty, and honesty that a fiduciary owes. Indeed, at the very minimum, a corporate officer must deal honestly with his corporation and must thereby disclose those facts which he is aware of that threaten the corporation's existence. In the case at bar, the record reveals that Gurtler not only failed to disclose such facts, but instead, intentionally hid developments (such as his attempt to obtain a loan for Gurtler Chemicals and his wife's copying of Unichem's labels) which were clearly harmful to Unichem. Accordingly, we agree with the trial court that Gurtler breached his fiduciary duty as a matter of law.

148 Ill.App.3d at 290–91, 101 Ill.Dec. 400, 498 N.E.2d 724.

The Court is convinced that Unichem was forced into bankruptcy as a result of Gurtler's conduct which resulted in lost sales

and profits for Unichem. Gurtler now proposes a plan which would force the liquidation of Unichem, one of his competitors, and eliminate the necessity of his payment of the judgment against him. Gurtler's inequitable conduct was the cause of Unichem's financial distress and he now attempts in his proposed plan to strike a final blow to Unichem's existence.

This court will not condone Gurtler's conduct by allowing him to file a plan in this case. Good faith as it is used in § 1129(b) relates to whether or not there is "a reasonable likelihood that the plan will achieve a result that is consistent with the objectives and purposes of the Bankruptcy Code." *Matter of Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984) *citing In the Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal.1982). Congress did not intend the objectives and purposes of the Bankruptcy Code to include rewarding an individual for breaching his fiduciary duty and allowing an individual to utilize the Bankruptcy Code to drive a competitor out of business. Instead, this court believes that Gurtler's actions in proposing a competing plan are in conflict with the objectives and purposes of the Bankruptcy Code. Therefore, the court concludes that Gurtler's plan is not filed in good faith and is unconfirmable. Since this plan, or any plan which Gurtler may submit,[5] is unconfirmable as a matter of law, the court is unable to approve Gurtler's disclosure statement.

THEREFORE, IT IS HEREBY ORDERED that the objections to Gurtler's disclosure statement are sustained. The court withholds approval of Gurtler's disclosure statement in accordance with 11 U.S.C. §§ 1125 and 1129.

---

5. It has been suggested that a creditor or the creditor's committee would propose the Gurtler plan in his stead. Such a scheme would have the same infirmities as if Gurtler were the principal proponent.