## In re EASTERN MAINE ELECTRIC COOPERATIVE, INC., Debtor.

### Bankruptcy No. 87–10290.

United States Bankruptcy Court,
D. Maine.

March 25, 1991.

Conley, Haley & O'Neil, Bath, Me., for EMEC.

John M. Grugan, Ferriter, Scobbo, Sikora, Caruso & Rodophels, Boston, Mass., Gary L. Blum, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for MMWEC.

Peter B. McGlynn, Rosen, Crosson, McGlynn & Resnek, Boston, Mass., for 16 Individual Participants.

John F. Logan, Logan, Kurr & Hamilton, Bangor, Me., for Project No. 6 Participants Committee.

Lloyd Randolph, Civ. Div., Dept. of Justice, Washington, D.C., for U.S.

## MEMORANDUM OF DECISION DISAPPROVING DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT

JAMES B. HAINES, Jr., Bankruptcy Judge.

The court today disapproves the debtor's third amended disclosure statement.[1] The procedural history culminating in its filing is lengthy and complex. Because a comprehensive overview of the case is set forth elsewhere, it will not be repeated here.[2] However, consideration of the disclosure statement, to which a critical analysis of the claims classification scheme proposed by the debtor is indispensable, dictates that today's discussion include a precis of the plan's evolution.

### I. Background.

Eastern Maine Electric Cooperative, Inc. ("EMEC"), is a rural electric cooperative serving areas within Eastern Maine. It is organized under Maine's statute specifically addressing such cooperative utilities. 35-A M.R.S.A. § 3701, et seq. EMEC's customers include some who are "members" of the cooperative, and some who are not.[3]

William C. Black, Public Advocate, Augusta, Me., for Maine Public Advocate.

Joanne B. Steneck, Maine Public Utilities Com'n. Augusta, Me., for MPUC.

Louis H. Kornreich, Gross, Minsky, Mogul & Singal, Bangor, Me., Mark Haley,

1. This memorandum constitutes the court's findings of fact and conclusions of law. B.R. 7052.

2. This court's memorandum addressing other issues provides background that the reader may find informative. *See In re Eastern Maine Electric Coop., Inc.,* 121 B.R. 917 (Bankr.D.Me.1990). Because references to that document will be

made throughout this opinion, it will henceforth be designated *"EMEC I."*

3. Members pay a $5.00 "membership fee" at the time they initially obtain service from EMEC. EMEC By-Laws (1986), MMWEC Ex. No. 2, at Article I, Sec. 4. According to EMEC's General Manager, James L. Dean III, 95% of the utility's customers are members. Transcript of hearings

EMEC sought refuge in Chapter 11 from the crush of financial obligations attending its involvement in purchasing a portion of the power to be generated by Public Service Company of New Hampshire's Seabrook Nuclear Power Project on August 31, 1987.[4]

## 1. Evolution of the Third Amended Plan.

EMEC has filed a succession of disclosure statements and proposed plans of reorganization[5]. The third amended plan proposes the following classifications:[6]

1. Class 1 treats individual rate payers with unsecured claims for residential deposits paid prior to the date of filing. Class members will have their deposits returned in accordance with the EMEC's bylaws and rules and regulations.

2. Class 2 includes the secured claims of the Rural Electrification Administration (REA) and National Rural Utilities Cooperative Finance Corp. (CFC). EMEC proposes to pay their claims in accordance with the pre-filing loan documentation. The REA and CFC will retain their joint security interest and mortgage in EMEC's real and personal property.

3. Class 3 comprehends those rate payers with claims arising from pre-filing deposits for commercial electric service. They will be paid the allowed amount of their claims in accordance with EMEC's by-laws and rules and regulations.

4. Class 4, an administrative convenience class, consists of creditors with unsecured claims of $200.00 or less and creditors who elect to reduce their claims to $200.00. Members will be paid in cash, without interest, on a post-confirmation distribution date.[7]

5. Class 5, the general unsecured class, includes the claims of MMWEC and other signatories to the Project No. 6 Agreement (the "Participants"),[8] among others. EMEC disputes all but a handful of the claims within this class, although it would accept the MMWEC claim as treated by the compromise approved by this court's order of May 11, 1990.[9] That order is presently on appeal to the United States District Court.[10] EMEC proposes to pay Class 5 claims pro-rata, by deferred payments with a present value of $7,293,271.15, distributed over thirty years. Class 5 has been impaired under each version of EMEC's plan. Although membership of Class 5 has remained constant, the dollar amounts to be distributed to its members has changed as a consequence of changes in EMEC's

of December 13, 1990, Vol. II, at page 7. Hereafter, all references to the December 13, 1990 transcript will be designated as "Tr.," accompanied by volume and page numbers.

4. The story of EMEC's involvement with the Seabrook project as a party to a joint-ownership power purchase agreement, known as the Project No. 6 Agreement, promoted by Massachusetts Municipal Wholesale Electric Company ("MMWEC"), is set forth in detail in *EMEC I*, 121 B.R. at 919 n. 4.

5. EMEC filed its first disclosure statement and plan of reorganization on September 14, 1988. This was followed by a first amended disclosure statement and first amended plan of reorganization filed July 2, 1990; a second amended disclosure statement and second amended plan or reorganization filed August 29, 1990; a modified second amended disclosure statement filed September 26, 1990; and, lastly, the third amended disclosure statement and third amended plan of reorganization, filed October 9, 1990.

6. Each edition of the plan has treated administrative claims identically. The composition and

treatment of such claims is not at issue and, therefore, will not be discussed here.

7. The only claims which fit into this class of which the Debtor is aware are the 2,500± ratepayers who have deferred credits, i.e., those who have paid membership fees or deposits, or overpaid their bills and subsequently terminated service and moved, without leaving the Debtor their forwarding address....The Debtor is unaware of the present address of these former ratepayers. EMEC Third Amended Disclosure Statement, Court Doc. No. 472, at 32.

8. *See supra* n. 4 and *EMEC I*, 121 B.R. at 919 n. 4.

9. The May 11, 1990 order capped MMWEC's recovery from the estate at $15,000,000.00. EMEC contends that the Participants' claims are derivative of MMWEC's claim. The Participants contend that each has a claim in its own right and they have filed individual proofs of claim totalling approximately $22,000,000.00.

10. See *EMEC I*, 121 B.R. at 920.

position regarding valuation of its enterprise.

6. Class 6 addresses EMEC's customers' rights to $1,294,509.72 "patronage capital" allocated to them prior to the bankruptcy filing. Patronage capital, a concept unique to cooperative organizations, accounts for excess revenues over expenses under a scheme defined by state law and the cooperative's by-laws.[11] EMEC's earlier proposals provided that each rate payer would retain the "value" of his allocated patronage capital credits, but that no distributions would be made to retire them until all senior classes, including the general unsecured claims in Class 5, were fully paid.[12] Later versions of the plan proposed to cancel patronage capital credits but provided that EMEC would employ their value to pay future expenses or to defer post-confirmation rate increases.[13] The third amended plan switches the class designation from "Capital Credits" to "Patronage Refunds" and, for the first time, calls for a monetary payment to class members. Instead of cancelling patrons' rights on confirmation, the plan now provides that class members are to be paid their pro-rata share of $200, 281.07, in cash, within one year of the effective date of the plan.

7. The cooperative's members' additional interests were initially treated as Class 7, but later addressed in Classes 7 and 8. The first two proposed plans permitted members of the cooperative to retain their interests to the extent of paid-in membership fees.[14] However, they provided that fees would not be refunded until allowed

administrative claims and senior unsecured claims, including Classes 5 and 6, were paid in full.[15] EMEC's second amended plan dealt with members' rights in their $5.00 membership fees in Class 7 and with their remaining rights, *e.g.*, to vote for management, in Class 8. The second amended plan provided that members of Classes 7 and 8 would not receive or retain any property on account of paid-in fees or other membership rights.

The third amended plan, while proposing that Class 8 claimants retain nothing on account of their nonpecuniary interests, provides that Class 7 claims are to be paid pro-rata shares of $6,447.78, in cash, within one year of the effective date of the plan.

2. Disclosure Hearings and Proceedings.

Hearings addressing the adequacy of EMEC's disclosure statement, which had by then evolved to its "modified second amended" stage, were held on October 2, 1990. Thereafter, the parties briefed disclosure issues in light of the evidence. It was in response to the hearings that EMEC further modified its proposals by filing its third amended plan and accompanying disclosure statement. Because the final edition of the plan included substantive changes regarding the treatment of claims, briefing was extended.

Responding to criticisms of its third amended plan, EMEC sought, and was provided, the opportunity to present evidence on classification.[16] Hearings ensued. The

---

**11.** *See* discussion *infra* at n. 28. All customers, members and non-members, receive patronage capital allocations. EMEC By–Laws (1986), MMWEC Ex. No. 2, Art. VII, Sec. 3, reproduced as Appendix A.

**12.** *See* EMEC's Plan of Reorganization, Court Doc. No. 162, and First Amended Plan of Reorganization, Court Doc. No. 379.

**13.** EMEC's Second Amended Plan of Reorganization, Court Doc. No. 425.

**14.** *See supra,* n. 3. EMEC By–Laws (1986) Article I, Section 6(c) provides that each member's $5.00 membership fee is to be repaid to a member upon withdrawal or termination of membership.

**15.** The first amended plan further specified that members would retain all other membership rights, including, presumably, the right to vote for management.

**16.** Bankruptcy Rule 3013 provides:

For the purposes of the plan and its acceptance, the court may, on motion after hearing on notice as the court may direct, determine classes of creditors and equity security holders pursuant to §§ 1122 and 1322(b)(1) of the Code.

Because EMEC's final amendments to the plan gave rise to serious issues regarding classification, all parties agreed that the proposed classifications in the third amended plan be considered as part of the disclosure statement approval process. As will become apparent, it

parties completed briefing the issues on February 8, 1991, and on that date the court took under submission all issues relating to the third amended disclosure statement and EMEC's classification strategy.

## II. *Discussion.*

Those opposing approval of the disclosure statement have articulated concerns within two broad categories. The first consists of objections, largely legal, to the classification and treatment of claims which, it is contended, render EMEC's plan unconfirmable on its face. The second is comprised of disputes, wholly factual, concerning the details of disclosure and its adequacy.

Before embarking on an analysis of the disclosure statement itself, exposition of the analytical framework to be employed is in order.

1. Standards for Disclosure Statement Review.

■ The court has an independent obligation to determine whether a disclosure statement includes adequate information within the meaning of the Bankruptcy Code. 11 U.S.C. § 1125(b). *See In re Cardinal Congregate I,* 121 B.R. 760, 764 (Bankr.S.D.Ohio 1990). The process necessarily entails two stages of analysis, although it is, more often than not, unnecessary to tarry long at the first.

If the disclosure statement describes a plan that is so "fatally flawed" that confirmation is "impossible," the court should exercise its discretion to refuse to consider the adequacy of disclosures. *In re Cardinal Congregate I, supra,* 121 B.R. at 764; *In re Monroe Well Service, Inc.,* 80 B.R. 324 (Bankr.E.D.Pa.1987); *In re Pecht,* 57 B.R. 137 (Bankr.E.D.Va.1986). Such an exercise of discretion is appropriate because

undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed. *See In re Pecht, supra.*

The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings. *In re Unichem Corp.,* 72 B.R. 95, 98 (Bankr.N.D. Ill.1987). Where the plan's inadequacies are patent, they may, and should be addressed at the disclosure statement stage. *Id.* Disclosure hearings anticipate, but do not preempt, confirmation hearings. *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 980 (Bankr.N.D.N.Y.1988). Accordingly, the disclosure statement should be disapproved at the threshold only where the plan it describes displays fatal facial deficiencies or the stark absence of good faith. *See In re Dakota Rail, Inc.,* 104 B.R. 138, 144 (Bankr.D.Minn.1989); *In re Unichem Corp., supra.*

Assuming that the proponent's efforts propel it over the initial hurdle, the statement's adequacy must be evaluated in light of the facts unique to the case. *In re Cardinal Congregate I, supra.* The debtor's particular circumstances must be taken into account.[17] *In re Microwave Products of America, Inc.,* 100 B.R. 376, 377 (Bankr.W.D.Tenn.1989). *In re Stanley Hotel, Inc.,* 13 B.R. 926 (Bankr.D.Colo.1981). *See also In re Metrocraft Pub. Services, Inc.,* 39 B.R. 567, 568 (Bankr.N.D.Ga.1984) (setting forth nineteen salient factors). *See also In re Cardinal Congregate I, supra; In re Dakota Rail, Inc., supra; In re Microwave Products of America, Inc., supra; In re Scioto Valley Mortg. Co.,* 88 B.R. 168 (Bankr.S.D.Ohio 1988); *In re S.E.T. Income Properties, III,* 83 B.R. 791 (Bankr.N.D.Okla.1988); *In re Jeppson,* 66 B.R. 269 (Bankr.D.Utah 1986).

is the revised treatment of classes 6 and 7 in the third amended plan that proves determinative of the disclosure statement's fate.

17. "Adequate information" is defined by 11 U.S.C. § 1125(a)(1) as follows:

1. "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the

nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan....

It is at the threshold that EMEC's effort falters. The court concludes, for the reasons discussed below, that the disclosure statement describes a plan of reorganization the ultimate failure of which is assured. In light of the facts clearly established by a well developed record, EMEC's plan exhibits defects that cannot be cured by balloting. *See In re Copy Crafters Quickprint, Inc., supra,* 92 B.R. at 980. "Submitting the debtor to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would unduly delay any possibility of a successful reorganization." *In re Pecht,* 53 B.R. 768, 769–70.

### 2. Applying the Standards.

#### a. *Issues Posed.*

EMEC's third amended plan is proposed as a cram down plan.[18] MMWEC, the largest unsecured creditor[19] has filed its own plan of reorganization and has made clear its intention to resist forced imposition of the debtor's proposal.[20] Yet another plan has been submitted by the Project No. 6 Participants' Committee (the "Committee").[21] EMEC's plan, if it is to be confirmed at all, must satisfy the Code's requisites for cram down.

MMWEC, the Committee, the REA and sixteen of the Participants in their individual capacities, urge the court to disapprove the disclosure statement because the clearly outlined treatment of "patronage capital" claims and "membership fee" claims abridges the Code's absolute priority rule.[22] In addition, MMWEC urges that the third amended plan cannot be confirmed because it has been proposed with manifest bad faith evidenced by its gerrymandering of classifications[23] and because treatment of nonpecuniary membership interests violates the absolute priority rule. MMWEC also argues that members of the cooperative are "insiders" and, therefore, that any class containing claims of members constitutes a class of insiders. Assuming the members' claims are impaired and that they vote to accept the plan, MMWEC suggests that the vote would not satisfy § 1129(a)(10).[24]

■ Several arguments can be dismissed out of hand. EMEC is a cooperative utility with over nine thousand members.[25] Individually, each member may participate in the management of the cooperative, much

---

**18.** 11 U.S.C. § 1129(b) sets forth conditions that must be satisfied in order for a plan that has not been accepted by all classes to be imposed. *See* n. 22, *infra.*

**19.** *See EMEC I,* 121 B.R. at 919–920.

**20.** It would be folly to proceed on any assumption other than that MMWEC and the Participants, which hold, by far, the controlling portion of unsecured claims, will reject EMEC's plan in its proffered form. *Cf. In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bankr.S.D. N.Y.1982) (confirmability considered in light of creditor's announced intention to reject plan in the context of proceedings regarding motion for relief from stay.)

**21.** *See* n. 4, *supra.*

**22.** A plan of reorganization may be confirmed only if each class of impaired creditors votes to accept it. There is one exception to the requirement of approval: 11 U.S.C. § 1129(b)(1), provides that a "fair and equitable" plan may be crammed down the throats of objecting creditors. The Code says that a plan treats unsecured creditors fairly and equitably if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). This is the "absolute priority rule". An objection to the plan may be overridden only if every class lower in priority is wiped out. Priority is "absolute" in the sense that every cent of each class comes ahead of the first dollar of any junior class.
*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1359 (7th Cir.1990) (citing Blum & Kaplan, *The Absolute Priority Doctrine in Corporate Reorganizations,* 41 U.Chi.L. Rev. 651 (1974)).

**23.** 11 U.S.C. § 1129(a)(3) requires that, to be confirmed, a plan must have been "proposed in good faith."

**24.** 11 U.S.C. § 1129(a)(10) provides:
If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

**25.** Tr., Vol. II, p. 39 (Dean testimony).

as an individual shareholder participates in the management of a corporation. Although, in the collective sense, the members control the cooperative, no individual member is "in control" of EMEC. Thus, the members are not insiders under the Code's definition [26] and, were this plan to be voted upon, classes of claims including those of members could be counted toward satisfying the requirements of § 1129(a)(10) that one impaired, non-insider class accept it.[27]

Although the proposed classifications and distributions are patently unsatisfactory, and lead to the conclusion that the disclosure statement must be disapproved, this is not a case in which one can reckon, from its very terms, that the plan has been proposed without the good faith the Code demands. *Cf. In re Unichem Corp., supra,* 72 B.R. at 99–100 (finding obvious bad faith).

### b. *Patronage Capital.*

Resolution of the confirmability controversy requires the court to explore more exhaustively the territory reconnoitered in earlier proceedings.[28] The Maine statute under which EMEC is organized provides the platform for our analysis. As a rural electric cooperative, EMEC is required first to apply its revenues to specific uses.[29] Thereafter:

Any remaining revenues shall, unless otherwise determined by a vote of the members, be distributed by the cooperative to its members as patronage refunds prorated in accordance with the patronage of the cooperative by the respective members, paid for during such fiscal year. Nothing in this section prohibits the payment by a cooperative of all or any part of is indebtedness prior to the date when it becomes due.[30]

Maine's enactment is not unique. Similar statutes address application of utility cooperatives' revenues in other jurisdictions.[31] Although specifically directed to utility cooperatives, those laws create an organizational structure similar to that of cooperatives generally.[32]

EMEC's by-laws further define patronage capital, its attributes and the character of and conditions upon patrons' entitlement to its worth. At the bankruptcy filing,[33] the by-laws provided that revenues received by the cooperative in excess of operating costs and expenses were to be credited to patrons' capital accounts annually.[34]

EMEC asserts that its obligation to pay patrons the amounts that were allocated to their patronage capital accounts pre-bankruptcy is fixed; that once the allocations

---

**26.** 11 U.S.C. § 101(30).

**27.** *Cf.* B.R. 3018(a) (expressly providing for voting by equity security holder).

**28.** In passing upon a request to order appointment of a committee of the cooperative's members pursuant to 11 U.S.C. § 1102(a)(2), this court determined that they hold a sufficient stake in the enterprise to qualify for appointment to an "additional committee" as either "equity security holders" or "creditors." *EMEC I,* 121 B.R. at 932. The committee was not formed, however, because the request came too late in the case. *Id.* at 933. The decision reserved for another day questions of proper classification and treatment of claims and interests in respect of patronage capital, membership fees and nonpecuniary membership attributes under reorganization plans. *Id.,* 121 B.R. at 931, n. 64. That day has arrived.

**29.** 35–A M.R.S.A. § 3705 provides that revenues of a cooperative shall first be applied to expenses, interest and obligations, reserve for con-

struction of facilities, reserve for working capital and reserve for indebtedness.

**30.** *Id.*

**31.** *See e.g.,* La.Rev.Stat.Ann. § 12:420 (West 1990); Tenn.Code Ann. § 65–25–212 (Michie 1990); 30 Vt.Stat.Ann. § 3030 (1989).

**32.** *See* Annotation, *Co-operative Associations: Rights in Equity Credits or Patronage Dividends,* 50 A.L.R.3d 435 § 7 (1973) (describing rights in equity credits and patronage dividends in non-utility cooperatives).

**33.** EMEC's by-laws were amended in 1983 and 1986. They have not been amended since the case was commenced. Tr., Vol. II, pp. 22–27, testimony of J. Dean.

**34.** *See* Appendix A. Before the allocation can be made the current positive margin must be used to eliminate any remaining negative margins from prior years. *Id. See also,* Tr., Vol. II, P. 30, testimony of J. Dean.

were made, each patron held an enforceable claim to the refund, notwithstanding the cooperative's ongoing use of it as working capital. In EMEC's view, from allocation forward, the cooperative uses patronage capital as an interest-free loan.

Because it considers that its obligation to retire patronage capital allocated to customer accounts before bankruptcy is absolute, EMEC's current plan provides for distribution of $200,281.07 to Class 6. This sum represents the class's pro-rata share of the amount available to unsecured creditors under its liquidation analysis.[35]

The opponents contend that, because Class 5 receives less than full payment, and because its rejection of the plan is assured, paying any amount to Class 6 offends the absolute priority rule. They argue that patronage capital is an "interest," rather than a "claim," and, alternatively, that if it is a claim, it is junior to Class 5.

Although the context in which we must consider the characteristics of patronage capital credits differs from that of other cases, today's effort is far from the first such undertaking. The relationship between the cooperative and its patrons is governed by state law and by the cooperative's articles by-laws. *In re Axvig*, 68 B.R. 910, 915 (Bankr.D.N.D.1987). The essence of that relationship, with regard to patronage capital or its analogues under other definitional schemes employed by other cooperatives, recognizes that a patron's ability to obtain the worth of his pro-rata share of excess revenues is a function of the cooperative's directors' discretion, exercised in light of the cooperative's financial health. In 1962, the Supreme Court of Mississippi stated:

It is well settled that equity credits allocated to a patron on the books of a cooperative do not reflect an indebtedness which is presently due and payable by the cooperative to such patron. Such equity credits represent patronage dividends which the board of directors of a cooperative, acting under statutory authority so to do, has elected to allocate to

its patrons, not in cash or other medium of payment which would immediately take such funds out of the working capital of the cooperative, but in such manner as to provide or retain capital for the cooperative and at the same time reflect the ownership interest of the patron in such retained capital. The interest will be paid to the patron at some unspecified later date to be determined by the board of directors of the cooperative. The word "capital" is intended to denote that capital which is of a nature comparable to the earned surplus of a conventional business corporation. The patron has no right to offset such equity credits, not being an indebtedness which is presently due and payable, against an indebtedness which is presently due and payable by him to the cooperative.

*Clarke County Cooperative v. Read*, 243 Miss. 879, 139 So.2d 639, 641 (1962). Holding that allocated patronage capital is not a fixed obligation, courts have consistently refused to permit a party to offset accrued patronage capital credits against sums owed to a cooperative, both within and without bankruptcy. *Id. See, e.g., In re Lamar Farmers Exchange*, 76 B.R. 712, 716 (Bankr.W.D.Mo.1987).

In response to attempts by patrons or their bankruptcy trustees to compel payment of patronage capital credits, the courts have held that, in the absence of an abuse of their discretion, the directors of a cooperative are free to refuse to pay value to retire a patron's account. *In re Great Plains Royalty Corp.*, 471 F.2d 1261, 1265 (8th Cir.1973) (agreeing that patronage dividends allocated cooperative patrons' accounts do not constitute an indebtedness of the cooperative unless the directors specifically authorize payment, but finding an abuse of discretion); *In re Beck*, 96 B.R. 161, 163 (Bankr.D.Colo.1988); *In re Axvig, supra*, 68 B.R. at 912; *In re Cosner*, 3 B.R. 445 (Bankr.D.Or.1980). Such attempts have failed even when the account allocation of such credits may create tax consequences for the patron to whom they are

---

**35.** The proposed distribution is intended to satisfy 11 U.S.C. § 1129(a)(7)(A)(ii)'s requirement

that each impaired claimant receives at least the liquidation value of his claim.

allocated. *Claassen v. Farmers Grain Cooperative*, 208 Kan. 129, 490 P.2d 376 (1971). In other words,

> patronage credits constitute an interest of the patron in the cooperative which is contingent and not immediately payable. This interest becomes vested only when the board of directors, in the exercise of its sound discretion, determines that such payments can be made in cash without causing undue financial hardship to the cooperative.

*Evanenko v. Farmers Union Elevator*, 191 N.W.2d 258, 261 (N.D.1971). EMEC nevertheless argues that the rights of those to whom patronage capital was allocated before commencement of the case constitute "claims" within the broad definition of the Code.[36] It attempts to distinguish the one case that squarely holds that a patron's claim for an amount due for dividends declared but unpaid by a cooperative does not constitute a claim in bankruptcy, *In re F.L.F. Farmers Co-operative Ass'n.*, 170 F.Supp. 497 (D.N.J.1958). EMEC argues that *F.L.F.* is a pre-Code case applying a more restrictive definition of "claim;"[37] that the cooperative was liquidating, a circumstance in which state law expressly subordinated patronage capital claims; and, more generally, that because *F.L.F.* involves a voluntary cooperative, it is inapposite this case, which involves a non-voluntary, monopoly utility cooperative. However, although EMEC's patrons deal with it out of necessity, rather than by choice, that difference gives rise to no principled distinction in this context.[38] Moreover, EMEC's own by-laws operate to subordinate claims for patronage capital credits to the claims of other creditors.[39]

Several recent bankruptcy court decisions illuminate the character of patrons' interests in allocated patronage capital accounts, including those of electric utility cooperatives, under the Code. In *In re Axvig, supra,* the court refused to compel several cooperatives to make immediate payment of a debtor's equity credits. Among those cooperatives was a rural electric cooperative, similar to EMEC. Reviewing that cooperative's by-laws, which were strikingly similar to EMEC's, the court found that allocated, but unpaid, capital credits did not give rise to an enforceable claim against the cooperative. 68 B.R. at 914–15. In *In re Shiflett*, 40 B.R. 493 (Bankr.W.D.Va.1984), the court considered whether allocated capital reserves in a dairy cooperative were accounts or accounts receivable, as opposed to general intangibles, in order to ascertain whether a secured creditor had perfected its security interest in them. Focusing on the cooperative's by-laws, the court observed that the directors had discretion to make payments

---

**36.** 11 U.S.C. § 101(4) provides as follows:

> (4) "claim" means—
>  (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>  (B) right to an equitable remedy for breach of performance is such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

**37.** Although the *F.L.F.* decision predates the Code, it sets forth a considered discussion of the rights of members *vis a vis* cooperatives, carefully distinguishing their rights from, *e.g.*, shareholders' rights to declared dividends. *In re F.L.F. Farmers Co-operative Ass'n, supra,* 170 F.Supp. at 500–501.

**38.** EMEC has made the point repeatedly that its members and patrons affiliate with it because they must in order to obtain power. It has not, however, explained how that circumstance would justify giving patrons rights in patronage capital on a par with the rights of the cooperative's creditors.

**39.** Although the state statute's provisions regarding priorities may leave room for argument, *see e.g.*, 35-A M.R.S.A. § 3755, the by-laws are clear:

> In the event of dissolution or liquidation of the Cooperative, after all outstanding indebtedness of the Cooperative shall have been paid, outstanding capital credits shall be retired without priority on a pro rata basis before any payments are made on account of property rights of members.

*See* Appendix A.

In the course of operations the EMEC directors' discretion to retire patronage capital is limited. It may do so only if the action would not impair the cooperative's "financial condition." *Id.* The plain meaning of that provision would preclude retirement of credits if to do so would mean that creditors would go unpaid.

in respect of the allocated credits only when the funds to be paid were not necessary for the proper financing of the cooperative's operations. Therefore, actual payment on account of allocated credits was conditional, subject to forfeiture, subject to the claims of other creditors, and undetermined in amount until the board of directors declared payment. Thus, the court held that the cooperative member had no "right to payment" and that the allocated funds did not constitute an account or account receivable, commenting, "it [the capital account] appears to be an *interest* in the nature of capital stock of a corporation." [40] Similarly, in holding that a Chapter 7 trustee could not compel a cooperative's directors to make payments on account of a debtor's "retained earnings balance," the court in *In re Beck* stated that the debtor's "patronage earnings account reflects, in this Court's view, an ownership *interest* in the Coop rather than a debt due and owing." [41]

Significantly, the foregoing cases found that the existence of allocated patronage capital did not give rise to a "right to payment", the *sine qua non* of a "claim" under the Code. [42]

EMEC asserts that its own past practices demonstrate that the rights of its patrons reach the status of claims in this case, notwithstanding the general rules. Although the evidence adduced during hearings demonstrated that EMEC's management has been uncertain of its obligations to allocate excess revenues as patronage capital under its by-laws, it also shows indisputably that since EMEC began allocating patronage capital to its patrons' accounts in 1983, it has "retired" through payment only $515.00 of such capital and, in each case, such retirements were made upon the patron's death. [43] There has never been an across-the-board retirement of EMEC's allocated patronage capital credits. [44]

Although EMEC's witnesses, including its general manager and one of its accountants, testified that they considered the cooperative's obligation to retire allocated patronage capital credits fixed, their testimony cannot overcome the legal import of the cooperative's own by-laws and the governing state law. [45] Other evidence does not establish historical practices that would support a finding that patrons ever possessed a "right to payment" of the capital

---

**40.** *Id.* 40 B.R. at 495 (emphasis added.)

**41.** 96 B.R. at 163 (citing cases) (emphasis added.)

**42.** The Code's broad definition necessitates that reorganization comprehend liquidation or estimation and treatment of future, putative, unliquidated, contingent and other such claims. *See* Epling, *Separate Classification of Future, Contingent and Unliquidated Claims in Chapter 11,* 6 Bankr.Dev.J. 173 (1989). The category of allocated, unretired patronage capital rights, however, is distinct from even those elusive creatures. All such claims have one feature in common: there exists or may come to exist a set of facts, capable of proof, that will require the debtor to encounter liability, whether it chooses to do so or not.

Allocated patronage capital need not be paid unless EMEC's directors affirmatively vote to do so. As to the pre-bankruptcy allocations in Class 6, the cooperative made no election to pay. In the absence of that election, and in the absence of an abuse of discretion in not so electing, the right to payment did not arise.

**43.** Although, if consistently followed, a policy of retiring credits allocated to deceased patrons may give rise to a claim that refusal to do so in

a given instance constitutes an abuse of the directors' discretion, *In re Great Plains Royalty Corp., supra,* the existence of such historical action, even were it to rise to the level of a regular "practice," is of no significance to the resolution of the pending issue.

**44.** Tr., Vol. II, p. 66 (Dean testimony).

**45.** The testimony was less-than-convincing in its own right. Philip W. Crawford, EMEC's accountant, acknowledged that patronage capital is classified as equity on the cooperative's financial statement because:

> [I]n order to be classified as a liability, it must meet some other criteria for accounting purposes. One of those criteria is that any obligation must have a maturity. Since patronage capital does not have a maturity, it cannot be classified for accounting purposes as an obligation.

Tr., Vol I, p. 17.

Mr. Dean acknowledged his own 1989 deposition testimony in which he characterized the cooperative's equity as consisting of two components, patronage capital and membership fees, and commented that the cooperative treated patronage credits as "donated capital." Tr., Vol. II, pp. 50–51.

credits allocated to them pre-filing. On occasion the cooperative had itself characterized patronage capital as representing "ownership" of the cooperative;[46] the books were kept consistently with the REA Chart of Accounts;[47] and, under that system, positive margins, once allocated to patrons, were shifted between capital accounts, but would not be booked as a liability (i.e. patronage payable) until the board voted to retire them.[48]

In summary, the legal force of state law and the cooperative's by-laws is undiminished by any evidence proffered by EMEC. Indeed, stripped of conclusory characterizations that were both unconvincing and self-serving,[49] all of the evidence is consistent with the conclusion that allocated patronage capital the directors have not voted to retire remains an ownership interest. It cannot permissibly be treated on a par with EMEC's unsecured debt.[50] As a class of interests junior to Class 5, Class 6 cannot receive or retain any property under the plan in the face of less than full payment of the senior claims.[51]

### c. Membership Fees.

■ Having considered treatment of allocated patronage capital, the impermissibility of EMEC's proposed distribution on account of membership fees requires only brief treatment. Once paid, the member retains no interest in the fee.[52] The fee is to be repaid only upon the member's withdrawal from the cooperative or upon the termination of membership.[53] At liquidation, after payment of all of the cooperative's obligations and of all allocated patronage capital credits, members receive distributions of remaining surplus pro rata in proportion to their total patronage over the preceding ten years.[54]

The disclosure statement and plan reveal EMEC's intention to distribute a share of the cooperative's value in excess of secured claims to members on account of their claims for repayment of their fees.[55] However, to the extent that claims for repayment existed and were unsatisfied on the petition date, they are included within Class 4.[56] Remaining members have no claim for fee repayment. They hold only ownership interests clearly junior to Class 5. Again, proposing any distribution on account of such claims with neither consent nor full payment of senior claims creates an unconfirmable plan.[57]

### d. Remaining Issues.

The objecting parties have also raised the issue whether, assuming Classes 6 and 7

**46.** Tr., Vol. II, p. 73 (Dean testimony).

**47.** Tr., Vol. II, pp. 37–38, (Dean testimony).

**48.** Tr., Vol. II, p. 166–67 (McMaster testimony). Mr. McMaster, a certified public accountant at the firm of KPMG Peat, Marwick in Columbus, Ohio since 1970, and a 14–year member of the National Society of Accountants for Cooperatives, testified on behalf of MMWEC.

**49.** That EMEC's earlier submitted plans straightforwardly treated allocated patronage capital as junior claims or interests and that the changes effected in the third amended plan would obviously result in beneficial changes in voting and in accomplishing an eventual cram down are not without significance.

**50.** The plan treats Class 5 substantially better than Class 6, but does so while providing Class 6 its § 1129(a)(7) liquidation value, the class's pro rata share of the difference of EMEC's going concern value and secured claim. Third Amended Disclosure Statement at 33–34.

**51.** 11 U.S.C. § 1129(b)(2)(B)(ii). The court expressly concludes, as an alternative basis for its holding, that if the allocated patronage capital credits are "claims" under the Code, they are junior to the claims of the cooperative's unsecured creditors. Contrary to EMEC's view, that conclusion does not require invocation of 11 U.S.C. § 510. It springs from the provisions of state law and EMEC's by-laws discussed above.

**52.** EMEC By-laws (1986), Article II, Sec. 1.

**53.** EMEC By-laws (1986), Article I, Sec. 4 and Article I, Sec. 6(c). Payment is, at that time, subject to offset for amounts owed to the cooperative. *Id.*

**54.** EMEC By-laws (1986), Article II, Sec. 1.

**55.** *See supra,* p. 6; third amended disclosure statement at 35–36.

**56.** *See supra,* p. 3; Third Amended Disclosure Statement at 32.

**57.** 11 U.S.C. § 1129(b)(2)(B)(ii). Were the expectation of fee repayment considered a "claim," it would be a claim subordinate to those in Classes 5 and 6. *See supra* n. 51.

are comprised of claims as presently constituted, they can permissibly be placed in separate classifications under 11 U.S.C. § 1122(a) and the law of the First Circuit.[58] Separate classification of categories of claims or interests that hold similar legal rights against the pre-bankruptcy debtor presents complex issues for the reorganization court, which must arrive at an appropriate solution "so that the good ship Rehabilitation may avoid the Scylla of over-rigidity and the Charybodis of unfairness."[59] Because today's conclusion is that Classes 6 and 7 contain interests of patrons and members distinct from, and junior to, unsecured claims, we need not navigate those waters.

### III. *Conclusion.*

For the reasons set forth above, EMEC's Third Amended Disclosure Statement is disapproved. A separate order will be docketed this date.

### APPENDIX A

*Excerpt from By–Laws of Eastern Maine Electric Cooperative, Inc.*

ARTICLE VII: DISPOSITION OF REVENUES AND RECEIPTS.

SECTION 3. Patronage Capital in Connection with Furnishing Electric Energy. In the furnishing of electric energy the Cooperative's operations shall be so conducted that all patrons will through their patronage furnish capital for the Cooperative. In order to induce patronage and to assure that the Cooperative will operate on a non-profit basis the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishing of electric energy in excess of operating costs and expenses properly chargeable against the furnishing of electric energy. All such amounts in excess of operating costs and expenses at the moment of receipt by the cooperative are received with the understanding that they are furnished by the patrons as capital. The Cooperative is obligated to pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses, provided, however, that any underpayments of capital, incurred by reason of operating deficit in any prior year or years shall be first deducted from the overpayments of capital in the current or future years, before any capital is credited to the patron. The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron, and the Cooperative shall within a reasonable time after the close of the fiscal year notify each patron of the amount of capital so credited to his account. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital.

All other amounts received by the Cooperative from its operations in excess of costs and expenses shall, insofar as permitted by law, be (a) used to offset any losses incurred during the current or any prior fiscal year and (b) to the extent not needed for that purpose, allocated to its patrons on a patronage basis and any amount so allocated shall be included as part of the capital credited to the accounts of patrons, as herein provided.

In the event of dissolution or liquidation of the Cooperative, after all outstanding indebtedness of the Cooperative shall have been paid, outstanding capital credits shall be retired without priority on a pro rata basis before any payments are made on

---

**58.** *Granada Wines, Inc. v. New England Teamsters Trucking Industry,* 748 F.2d 42 (1st Cir. 1984) includes dictum which asserts that, beyond the Code's requirement that a class contain only "substantially similar" claims or interests, such claims or interests must be included in the same class. 748 F.2d at 46–47.

**59.** Riesenfeld, *Classification of Claims and Interests in Chapter 11 and 13 Cases,* 75 Calif.L.Rev. 391 (1987). *See also* Epling, *Separate Classification of Future Contingent and Unliquidated Claims in Chapter 11, supra.*

account of property rights of members. If, at any time prior to dissolution or liquidation, the board shall determine that the financial condition of the Cooperative will not be impaired thereby, the capital credited to patrons' accounts may be retired in full or in part. As of October 29, 1983, the Board of Directors shall determine the method basis, priority and order of retirement, if any, for all amounts heretofore and hereafter furnished as capital. In no event, however, may any capital be retired unless, after the proposed retirement, the capital of the Cooperative shall equal at least forty percentum (40%) of the total assets of the Cooperative except that if the retirements of capital permitted by the following paragraph do not in such year exceed 25% of such margins less the distributions to estates of deceased partrons (sic.).

Capital credited to the account of each patron shall be assignable only on the books of the Cooperative pursuant to written instruction from the assignor and only to successors in interest or successors in occupancy in all or a part of such patron's premises served by the Cooperative unless the board, acting under policies of general application, shall determine otherwise. In the event that a non-member patron shall elect to become a member of the Cooperative the capital credited to the account of such non-member patron may be applied by the Cooperative toward the payment of a membership fee on behalf of such non-member patron.

Notwithstanding any other provision of these by-laws, the board at its discretion, shall have the power at any time upon the death of any patron, if the legal representatives of his estate shall request in writing that the capital credited to any such patron be retired prior to the time such capital would otherwise be retired under the provisions of these by-laws, to retire capital credited to any such patron immediately upon such terms and conditions as the board, acting under policies of general application, and the legal representatives of such patron's estate shall agree upon; provided, however, that the financial condition of the Cooperative will not be impaired thereby.

The patrons of the Cooperative, by dealing with the Cooperative, acknowledge that the terms and provisions of the articles of incorporation and by-laws shall constitute and be a contract between the Cooperative and each patron, and both the Cooperative and the patrons are bound by such contract, as fully as though each patron had individually signed a separate instrument containing such terms and provisions. The provisions of this article of the by-laws shall be called to the attention of each patron of the Cooperative by posting in a conspicuous place in the Cooperative's office.